STATE OF CONNECTICUT *v.* BERNARD
A. BRANDON
(SC 20371)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Keller and Bright, Js.*

*Syllabus*

Convicted of manslaughter in the first degree with a firearm in connection
with the shooting death of the victim, the defendant appealed to this
court. The defendant, who had been serving probation for a prior convic-
tion, was at a gambling club, where he and the victim engaged in a
heated argument after the victim did not pay the defendant money he
believed he was owed. Later that night, the victim called the defendant's
phone, apologized, and suggested that they meet for drinks. The defen-
dant then drove to a local bar and parked his car near the victim's car.
After the defendant and the victim exited their respective vehicles, the
defendant shot the victim multiple times. Before trial, the defendant
moved to suppress, inter alia, statements that he had made to the police
during two recorded interviews. The first interview took place several
days after the shooting, right after the defendant attended a regularly
scheduled meeting with his probation officer at the probation office. At
the conclusion of that meeting, the probation officer told the defendant
that some individuals who wished to speak with him were waiting in
her supervisor's office, which was in a locked area of the building. The
defendant then was escorted to that office, where he was interviewed
for ninety minutes by two plainclothes police officers, without being
advised of his rights pursuant to *Miranda* v. *Arizona* (384 U.S. 436).
After the first twenty-one minutes of that interview, during which the
defendant admitted to a version of events that placed him near the bar
at the approximate time of the shooting, the officer told the defendant

---

* This case originally was argued before a panel of this court consisting
of Chief Justice Robinson and Justices McDonald, D'Auria, Mullins, Kahn,
Ecker and Keller. Thereafter, Justice Kahn was removed from the panel,
and Chief Judge Bright was added to the panel. He has read the briefs
and appendices, and listened to a recording of the oral argument prior to
participating in this opinion.

State *v.* Brandon

that he was free to leave and that he was not under arrest. The officers advised the defendant at least five more times that he was free to leave, but he did not terminate the interview or leave the room. The interview continued, and, after the officers pressed the defendant, he changed his story, implicated another individual, O, in the shooting, and used his cell phone to find O's phone number, which he read out loud to the officers. At the conclusion of the interview, the officers seized the defendant's cell phone and arranged to meet with him later that evening for the second interview, which took place in an interrogation room at the police station. The police advised the defendant of his *Miranda* rights at the outset of the second interview, and, at the end of that interview, the defendant left without being placed under arrest. In support of his motion to suppress, the defendant argued that his statements during the first interview should be suppressed on the ground that it was a custodial interrogation and that the police violated his rights by failing to provide him with *Miranda* warnings prior to the interview. The defendant challenged the admission of statements made during the second interview, contending that that interview violated the principle that the provision of *Miranda* warnings midstream, after a suspect has offered a confession during a custodial interrogation, violates the constitutional requirements safeguarded by *Miranda*. The trial court denied the defendant's motion to suppress the statements that he made during his first and second interviews, concluding that the first interview was not custodial and, therefore, that the rule pertaining to midstream *Miranda* warnings was inapplicable with respect to the second interview. On the defendant's appeal from the judgment of conviction, *held*:

1. The trial court properly denied the defendant's motion to suppress the statements he had made during the first interview because, notwithstanding the coercive elements of that interview, a reasonable person in the defendant's position would not have believed that he was restrained to a degree associated with a formal arrest, and, therefore, the defendant was not in custody during that interrogation:

The defendant was questioned in a coercive environment insofar as the interview was conducted by two armed police officers in a secured area of the probation office, immediately after the defendant's mandatory meeting with his probation officer, no one told the defendant that the individuals waiting to speak to him were police officers, the officers made it clear during the interview that the defendant was the prime suspect, and the officers seized the defendant's cell phone at the end of the interview, but a coercive environment, without more, does not establish that the interview was custodial.

In light of the totality of the circumstances, this court was persuaded that the coercive elements of the first interview were offset by other factors and did not rise to the degree of restraint associated with a formal arrest, as the record did not reveal that the probation officer had

State *v.* Brandon

ordered the defendant to meet with the police officers, that the defendant had objected to the meeting, that the defendant had told the probation officer that he did not have time to attend, or that the defendant had asked the probation officer if he was obligated to go, and the simple fact that the defendant was on probation was insufficient to render any request from his probation officer coercive.

Moreover, the application of the factors identified in *State* v. *Mangual* (311 Conn. 182) that a court should consider in evaluating whether an individual is in custody for *Miranda* purposes to the facts of the present case further supported the conclusion that the defendant was not restrained to a degree associated with a formal arrest during the first interview.

Specifically, the nature, extent and duration of the questioning, as well as the length of the defendant's detention, weighed against a conclusion that he was in custody because the tone and tenor of the interview were cordial, insofar as the officers never raised their voices, and both the interview and the detention of the defendant lasted for only ninety minutes.

The factors relating to the number of officers present during the interview, whether they were armed, displayed their weapons, or used force, and whether the defendant was physically restrained, when viewed together, weighed against a conclusion that the defendant was in custody because, although the interrogating officers displayed their badges and guns and had handcuffs, there were only two of them, they did not physically threaten or restrain the defendant, handcuff him, use force, or brandish their weapons, and the defendant presented no evidence that the circumstances surrounding the interview were akin to those surrounding the police station interrogations at issue in *Miranda*.

The fact that, after the first twenty-one minutes of the interview, the police officers repeatedly advised the defendant that he was free to leave and that he was not under arrest, and the fact that the defendant chose to remain and never asked to leave, also weighed against a conclusion that the defendant was in custody, insofar as those facts suggested an exercise of free will, rather than restraint to a degree associated with a formal arrest, and, although the officer's advisements would have weighed even more heavily in favor of a conclusion that the defendant was not in custody if they had been given at the outset of the interview, a failure or delay to advise a defendant that he is free to leave or not under arrest does not necessarily result in a finding of custody, especially when the defendant in the present case left the interview without being placed under arrest.

Although the facts that the police initiated the encounter by making arrangements with the probation office and that no one told the defendant that the individuals waiting to meet him were law enforcement officers

State *v.* Brandon

weighed modestly in favor of a conclusion that the defendant was in custody, such a conclusion was undercut by the defendant's acquiescence to the meeting, and, although the defendant's probation officer had told the defendant that certain individuals wished to speak with him, she did not order the defendant to attend the meeting or use coercive language, and, thus, a reasonable person in the defendant's position would not have felt restrained to a degree associated with a formal arrest.

The location of the interview in the probation office provided some support for the defendant's contention that he was in custody, insofar as the defendant needed to be escorted into the building in which the probation office was located and the secured areas therein, but there was no evidence concerning the character of the office in which he was interviewed or concerning whether any limitations were placed on the defendant's ability to leave the building or the secured areas therein.

Furthermore, although the defendant's status as a probationer who was questioned in the probation office may have contributed to the coercive aspects of the interview, it did not transform a noncustodial interrogation into a custodial one, especially when the defendant was not ordered to meet with the police officers, the questioning occurred only after the mandated meeting with the probation officer had concluded, and the police officers informed the defendant that he was free to leave and was not under arrest.

With respect to the degree to which the defendant was isolated during the interview, the fact that the police officers chose to conduct the interview in a secured area of the probation office was offset by the defendant's familiarity with the probation office and his failure to introduce evidence regarding the character of the building and how the probation office was situated therein, and the fact that the defendant's cell phone was seized was of no consequence because he did not establish that it was seized prior to the final few minutes of the interview, and the record demonstrated that he used his cell phone during the interview to search for O's contact information rather than that he was prevented from using the phone to contact anyone.

2. The trial court properly denied the defendant's motion to suppress the statements that he had made during the second interview, that court having correctly determined that the defendant was not in custody during the first interview, and the defendant's challenge with respect to the second interview having been predicated on his claim that he was in custody during the first interview.

(*One justice concurring separately*; *two justices dissenting in one opinion*)

Argued January 20—officially released December 30, 2022**

** December 30, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* Brandon

*Procedural History*

Amended informations charging the defendant with the crimes of murder and criminal possession of a pistol or revolver, brought to the Superior Court in the judicial district of Fairfield, where the court, *E. Richards, J.*, denied in part the defendant's motion to suppress certain evidence; thereafter, the charge of murder was tried to the jury before *E. Richards, J.*; verdict of guilty of the lesser included offense of manslaughter in the first degree with a firearm; subsequently, the state entered a nolle prosequi as to the charge of criminal possession of a pistol or revolver, and the court, *E. Richards, J.*, rendered judgment in accordance with the verdict, from which the defendant appealed to this court. *Affirmed.*

*Aaron J. Romano*, for the appellant (defendant).

*Timothy F. Costello*, senior assistant state's attorney, with whom, on the brief, were *Joseph T. Corradino*, state's attorney, and *David R. Applegate*, senior assistant state's attorney, for the appellee (state).

*Opinion*

MULLINS, J. The principal issue in this appeal is whether the defendant, Bernard A. Brandon, was in custody when police officers interrogated him in the office of probation following a routine meeting with his probation officer. The defendant appeals from the judgment of conviction, following a jury trial, of manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a (a).[1] The defendant claims that the trial court improperly denied his motion to

---

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

State *v.* Brandon

suppress the statements he made during two separately recorded interrogations of him by police officers.[2]

As to the first interrogation, which occurred on February 16, 2016, sometime between 11 a.m. and noon, at the Bridgeport Office of Adult Probation, the defendant contends that, because the police failed to advise him of his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the interrogation violated his rights under the fifth and fourteenth amendments to the United States constitution. As to the second interrogation, which occurred later on the same day, at approximately 6 p.m., at the Bridgeport Police Department, the defendant claims that, notwithstanding the fact that the officers had issued *Miranda* warnings at the outset of that interrogation, it was tainted by the alleged illegality of the first interrogation.[3] We disagree. After review, we have determined that the first interrogation was not custodial, and, therefore, that *Miranda* warnings were not required. Consequently, the failure to provide them did not violate the defendant's rights and did not taint the second interrogation. Accordingly, we conclude that the trial court properly denied the defendant's motion

---

[2] The trial court granted the defendant's motion to suppress the statements that he made during a third interview, on the basis that, after the defendant made statements that were ambiguous as to whether he was invoking his right to counsel, the police did not attempt to clarify those statements and, instead, continued questioning him. See *State* v. *Purcell*, 331 Conn. 318, 321, 203 A.3d 542 (2019) (holding that article first, § 8, of Connecticut constitution requires that law enforcement personnel clarify ambiguous requests for counsel before continuing interrogation).

[3] The defendant contends that the trial court's denial of his motion to suppress the statements that he made during the first two interviews violated his rights under article first, §§ 8 and 9, of the Connecticut constitution. "[B]ecause the defendant has not provided an independent analysis of his state constitutional claim under *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), we consider that claim abandoned and unreviewable." (Internal quotation marks omitted.) *State* v. *Rivera*, 335 Conn. 720, 725 n.2, 240 A.3d 1039 (2020).

State *v.* Brandon

to suppress the statements he made during the two interrogations and, therefore, affirm the judgment of the trial court.

The jury reasonably could have found the following facts.[4] In the afternoon of February 11, 2016, the defendant and the victim, Javoni Patton, were rolling dice with a number of other persons at an establishment called the Jamaican Gambling Club, near the intersection of Park Avenue and Vine Street in Bridgeport. The defendant believed that the victim was doing well in the games; he estimated that the victim had won $4000 that afternoon. By contrast, the defendant had lost between $400 and $500.

At some point that afternoon, the victim told the defendant that he had just won $20,000 at a casino and had purchased a Mercedes-Benz (Mercedes) with his winnings. The victim then placed a set of Mercedes key fobs on the table. The defendant picked them up and claimed he saw "E55" on the key fobs. When the victim later stated that the Mercedes was an E550, the defendant said he was wrong—it was an E55. They initially wagered $500 over the dispute, which became heated. When they turned the key fobs over, the defendant claimed, they saw "E55" on one side and "E550" on the other. The defendant continued to believe he had won the bet but offered to accept only $100 in payment from the victim. The victim did not pay the defendant any money.

After leaving the club, the victim called the defendant's phone three times, between 8:15 and 8:23 p.m. The defendant told the police that, when he and the

---

[4] We note that "we review the record in its entirety to determine whether a defendant's constitutional rights were infringed by the denial of a motion to suppress." *State* v. *Kendrick*, 314 Conn. 212, 218 n.6, 100 A.3d 821 (2014); see, e.g., *State* v. *Fields*, 265 Conn. 184, 191, 827 A.2d 690 (2003) ("record on review of ruling on pretrial motion to suppress includes evidence adduced at trial"); see also, e.g., *State* v. *Toste*, 198 Conn. 573, 576, 504 A.2d 1036 (1986).

State *v.* Brandon

victim spoke over the phone at 8:23 p.m., the victim apologized for his earlier conduct and suggested that they meet for drinks at the Thirty Plus Social Club, a bar known as Robin's, located at the intersection of Connecticut and Stratford Avenues in Bridgeport.

The defendant left the Jamaican Gambling Club sometime around 8:27 p.m. He drove to Robin's, where the victim waited in his Cadillac, which was parked at the intersection between Connecticut and Stratford Avenues. The defendant parked his Audi near the victim's car, after which he and the victim both exited their vehicles. The defendant shot the victim multiple times, hitting him in the chest, the right hand and in the back of both legs. The victim died from the gunshot wound to his chest. The defendant drove away.

Three recorded interviews of the defendant by the police featured heavily in the state's case against him. The first interview took place in the probation office in Bridgeport on February 16, 2016, immediately following the defendant's regularly scheduled meeting with his probation officer. The police conducted the second interview approximately five hours later, in the police station. The third interview took place two days later, in an unmarked police car in a Burger King parking lot. Before trial, the defendant moved to suppress all of the statements he made during the three interviews. Following a hearing on the motion, the trial court denied the motion to suppress as to the first two interviews and granted it as to the third. Subsequently, during trial, defense counsel notified the court that, without waiving the objection to the introduction of the defendant's statements during all three interviews, in light of the court's denial of the motion to suppress the statements that the defendant made during the first two interviews, he would offer the statements made during the third interview in order to provide context for the first two.

State *v.* Brandon

The state charged the defendant with murder in violation of General Statutes § 53a-54a (a) and criminal possession of a pistol or revolver in violation of General Statutes (Supp. 2016) § 53a-217c (a) (1).[5] Following the trial, the jury found the defendant not guilty of murder but guilty of the lesser included offense of manslaughter in the first degree with a firearm. The state subsequently entered a nolle prosequi as to the charge of criminal possession of a pistol or revolver. The trial court sentenced the defendant to twenty-seven years of incarceration. This appeal followed.

We begin by observing that, because the state does not challenge the trial court's determination that the first interview constituted an interrogation, that question is not before us in this appeal. Our sole task is to resolve whether the defendant was in custody during that interrogation. That is, as we explained, the defendant's challenge to the trial court's denial of his motion to suppress as to both the first and second interviews rests on his assertion that he was in custody during the first interrogation. Accordingly, our conclusion that the trial court correctly determined that the defendant was not in custody during the first interrogation is the dispositive issue in this appeal. The following facts, which either were found by the trial court or are undisputed, are relevant to this issue.[6]

On February 16, 2016, the defendant, who was serving probation for a prior domestic violence conviction,

---

[5] The state also charged the defendant with carrying a pistol without a permit in violation of General Statutes (Supp. 2016) § 29-35 (a). After the conclusion of evidence, but prior to jury deliberations, the trial court granted the defendant's motion for a judgment of acquittal as to that charge.

[6] See, e.g., *State* v. *Griffin*, 339 Conn. 631, 655 n.12, 262 A.3d 44 (2021) ("Appellate review of the trial court's resolution of a constitutional claim is not limited to the facts the trial court actually found in its decision on the defendant's motion to suppress. Rather, [this court] may also consider undisputed facts established in the record, including the evidence presented at trial." (Internal quotation marks omitted.)), cert. denied,　　U.S.　　, 142 S. Ct. 873, 211 L. Ed. 2d 575 (2022).

State *v.* Brandon

reported to the probation office in Bridgeport for his regularly scheduled meeting with his probation officer, Shavonne Calixte. In order to meet with Calixte, the defendant had to pass through several layers of security. When members of the public enter the building where the probation office is located, they must pass through a metal detector and security check in the first floor lobby in order to access the elevators to the floors occupied by the probation office, which include at least the second and third floors of the building.[7] The offices on the second and third floors are within locked areas; probationers may enter only with the assistance of an escort. The record is silent as to whether a member of the public may leave without the assistance of an escort upon the conclusion of his or her business with the probation office. Although there was testimony at the suppression hearing that a member of the public could not enter the secure areas on the second and third floors of the probation office without being provided with an escort, there was no testimony that egress from those areas is similarly restricted.

The defendant met with Calixte in a reporting room on the third floor. At the conclusion of their meeting, Calixte told the defendant that some persons who wished to speak with him were waiting on the second floor, in the office of her supervisor, Peter Bunosso.[8]

---

[7] The record is unclear as to whether the probation office occupies the entire building, or, if it does not, what other agencies or offices share the building with the probation office.

[8] The record is unclear regarding whether Bunosso informed Calixte in advance about the individuals who were waiting to speak to the defendant and whether he told her that they were members of law enforcement. The testimony of Calixte and Bunosso is somewhat inconsistent on these points.

Calixte testified that she learned about the individuals only at the end of her meeting with the defendant, as she was "wrapping up . . . ." She also testified that she could not recall whether Bunosso informed her at that time that they were members of law enforcement. All she could say with certainty was that, after the fact, she knew that the individuals who had been waiting to speak to the defendant were police officers.

Bunosso testified that, on February 15, 2016, one day prior to Calixte's meeting with the defendant, he had contacted her to find out the date of the

State *v.* Brandon

Although she could not recall whether she expressly
told the defendant that he did not have to meet with
the unidentified persons, Calixte was certain that she
did not tell him he was obligated to speak to them.[9]
She escorted the defendant to the second floor, where
they met Bunosso.

---

defendant's next meeting. According to Bunosso, during that conversation,
consistent with his usual practice in such circumstances, he informed Calixte
that the police wished to speak with the defendant afterward. Bunosso
also testified that, when the defendant reported for his February 16, 2016
probation meeting, Bunosso informed Calixte that police officers wished
to speak to the defendant after that meeting was finished.

In any event, whether Calixte intentionally withheld information from the
defendant or was provided with incomplete information is irrelevant to the
question of whether the defendant was in custody in the present case. It is
undisputed that Calixte did not inform the defendant in advance that the
individuals who waited for him were members of law enforcement. Regard-
less of who withheld that information from whom, the request to the defen-
dant to meet with the law enforcement officers did not inform him of all
the relevant information. In our analysis, we discuss the significance of that
failure to inform the defendant of the identity of the individuals waiting to
speak with him.

[9] At this juncture, the record reveals somewhat ambiguous testimony from
Calixte regarding whether, after telling the defendant that the probation
meeting was over, she took the additional step of also telling him, in specific
terms, that he had a choice whether to attend the meeting. Specifically,
during cross-examination at the suppression hearing, Calixte stated that she
did not tell the defendant, "you're going to see my supervisor now." Instead,
as she recalled:

"[Calixte]: I basically let [the defendant] know the office visit was con-
cluded. We were done, and we were walking downstairs, but, if he had a
moment, he [could] speak to someone else who would like to talk to him.

"[Defense Counsel]: Do you recall whether . . . you gave [the defendant]
any choice to—to not—

"[Calixte]: There's always a choice. *Of course, I gave him a choice.*

"[Defense Counsel]: You told him . . . I'm going to take you downstairs
now, okay. My supervisor wants to see you, but you don't have to see my
supervisor. Is that your recollection?

"[Calixte]: I don't recall. I don't recall." (Emphasis added.)

Although the record reflects that Calixte testified literally that she gave
the defendant a choice, because the preceding question was cut off and the
follow-up answer to the next question was "I don't recall," there is some
ambiguity as to whether Calixte's testimony reflects that she affirmatively
told the defendant that he had a choice to attend the meeting. In any event,
because the record does not reflect that Calixte in any way coerced the

State *v.* Brandon

Bunosso then escorted the defendant to his office, which was within a locked area. Two police officers, Lieutenant Christopher LaMaine and Detective Ada Curet, waited in the office for the defendant. Bunosso did not remain for the interrogation. He removed some work files, left and closed the door behind him. No member of the probation office was present for the interrogation.

LaMaine testified that, on the day of the interrogation, he wore plain clothes and that both his badge and his gun were visible. Curet was dressed similarly, also with a badge and gun visible. Although LaMaine and Curet both had handcuffs, LaMaine was uncertain whether the defendant could see them. Neither of the officers brandished their weapons, used their handcuffs, or restrained the defendant in any way during the interrogation. The defendant sat closest to the door, and at no time during the interrogation did the officers block the door. No testimony was offered regarding the size of the office.

The interrogation lasted about ninety minutes. LaMaine, who asked most of the questions during the interrogation, began by informing the defendant that he and Curet were "talking to people" who knew the victim. During the first approximately twenty-one minutes of the interrogation, LaMaine elicited the defendant's initial account of the events on the night of the shooting.

Specifically, the defendant told the police that, in the afternoon on the day of the shooting, he and the victim had both been rolling dice at the Jamaican Gambling Club. He admitted that, while there, he and the victim engaged in a heated argument over the particular model

defendant to attend the meeting, her testimony, as a whole, supports our conclusion that the defendant was not forced to attend the meeting.

State *v.* Brandon

of the Mercedes that the victim claimed to have purchased with money he had won at a casino.

The defendant initially claimed that he left the club before the victim did. He left alone, he said, in his blue 2004 Audi, sometime between 7 and 7:30 p.m. At around 8 p.m., he claimed, he arrived at another gambling establishment, Old Timers, or "Mr. B's," on Stratford Avenue, between Carroll and Wilmot Avenues. He claimed that he parked his car in front of Old Timers and was inside the establishment when emergency vehicles passed by at around 8:36 p.m. Soon afterward, he and some friends walked to a nearby liquor store, Jimmy's Liquors, where one of the group had parked his truck. They got into the truck and, while they were driving around, noticed the taped off area at Robin's. At around that time, a member of the group received a phone call informing him that the victim had been shot. The defendant said that he retrieved his car from the front of Old Timers sometime around 9 p.m., and then drove to his girlfriend's house.

After the defendant provided this account of his movements, LaMaine began questioning him in greater detail regarding the nature of his dispute with the victim at the Jamaican Gambling Club. He asked the defendant to provide details regarding who saw the dispute, how heated it became, and whether it escalated into a physical confrontation. LaMaine then confronted the defendant with the fact that the victim subsequently called him and asked the defendant to meet him at Robin's. The defendant admitted that he received the phone call and acknowledged that the victim had asked to meet there, but the defendant denied that he went "down that way." When LaMaine reminded the defendant that "there's a camera at [the intersection of] Stratford and Hollister," the defendant admitted that he had "most likely" taken a right onto Stratford Avenue from Hollister Avenue and then turned at the intersection

State *v.* Brandon

between Stratford and Connecticut Avenues, a route that took him directly past Robin's, which is at the intersection between the two streets. LaMaine then added, "at . . . 8:33." When the defendant hesitated, LaMaine said, "I'm just telling you what the camera showed." LaMaine again stated that the defendant turned from Stratford Avenue onto Connecticut Avenue at 8:33 p.m. This time, the defendant said, "I guess so." That admission placed the defendant in front of Robin's at the approximate time of the shooting, albeit only momentarily.

LaMaine pressed the defendant further, obtaining an admission from him that, based on his 8:23 p.m. phone conversation with the victim, the defendant knew, when he drove past Robin's at 8:33 p.m., that the victim was there. The defendant continued to maintain, however, that he "rolled down through there," and he did not see the victim.

LaMaine then said: "He was parked right there. And you stopped for, well, two minutes, [one and one-half minutes], almost two minutes. You did. And then you continued on. And there's a lot of cameras, both at Stratford and Connecticut [Avenues]. I'm not even talking about the ones we own. There's a lot of cameras, [on] just about every store, building, even Robin's. If you have a chance, [and] you go by, you'll see a camera right there. You'll see a camera. It's on the Stratford [Avenue] side. And then, right next to it, [there] is a place called . . . Derek's Auto Parts. It's the building that abuts right up against Robin's. And they have cameras on both sides. Stratford and Connecticut [Avenues]. You can go back, I mean, there's an endless number of cameras. Every store has a camera. . . . Yeah. And that's not even counting our good ones. And our cameras are so good [that] we can read license plates, because we know that's why we're going to be using them. So, this is what brings us to you. You went

State *v.* Brandon

there. And there's also people in the bar. You've been in that bar. . . . So, you know [that] next to the window . . . there's a window as big as this . . . waist high. And they can see out. . . . Now, I'm not going to tell you I know everything that was said. And there was a dispute, and [the victim] was hot. But you and him got into a little thing there. And we just want to hear your side of it.''

When the defendant responded, "[y]eah . . . on Park Avenue,'' LaMaine said: "No. . . . I'm talking about where he was shot. Maybe he brought a gun. Maybe you took it from him. All I know is that you and him got into a dispute at his car. That's why we're here. Okay. And we want to hear your side of it. *You're not going out of here in handcuffs. Okay. You're not. You're going to walk out of here. Nothing you say is going to get you arrested today.* Okay. We're here to get to the truth, and that's our only job.'' (Emphasis added.)

Less than thirty seconds later, LaMaine told the defendant that, if he wanted to, he could "walk away right now . . . .'' LaMaine and Curet advised the defendant five additional times that he was free to leave. Most of those warnings were within five minutes after the first advisement. Specifically, in the five minutes after LaMaine first told the defendant that he was not under arrest and was free to leave, he also stated: "[y]ou can leave right now if you want''; "[n]o matter what you say, you're going to walk out of that door''; "[y]ou can walk out right now''; and "[l]ike I said, you're free to go.'' At a later point in the interrogation, Curet reminded the defendant that he was going to "walk out this door.''

Approximately one third of the way through the interrogation, LaMaine began to make clear to the defendant that, if he left without providing the police with information to the contrary, he would remain their prime suspect, and they would likely seek a warrant for his arrest.

State *v.* Brandon

He also suggested that, if the defendant provided that information sooner rather than later, his account would likely be deemed more credible. For example, after the fifth time LaMaine advised the defendant that he could leave the interrogation, he also said that, if the defendant left, "we gotta go on the facts we have. There's just the two of you there. . . . [S]omehow [the victim] gets shot when it's just the two of you. . . . [W]e're probably gonna be writing a murder warrant for you. And, down the road, you might want to say, okay, well, I want to tell my side of the story, like . . . he pulled a gun or something. . . . But it's gonna not sound very credible because everybody, when they're jammed up, says, 'oh, well, let me tell you, this is self-defense, or he pulled a gun.' . . . But it just won't be credible because, yeah, everybody comes up with it once they're arrested."

The defendant did not choose to terminate the interrogation or to leave the room after any one of the advisements that he could leave or walk out. Thus, LaMaine continued to press him for information. As part of LaMaine's interrogation strategy, he emphasized the incriminating effect of the video footage, telling the defendant that "the video doesn't lie" and reminding the defendant that, because it was bitterly cold on the night of the shooting, virtually no one else would be captured on the outdoor video footage. At the same time, LaMaine misrepresented what the video footage depicted. For example, LaMaine told the defendant that the video showed the defendant driving away while the victim ran and staggered into the middle of the road, then collapsed almost at the Stratford line. Our review of the record does not reveal any such video footage.

About thirty-five minutes into the interrogation, the defendant abandoned his initial story, beginning with his admission that he had, in fact, stopped at Robin's. LaMaine drew a rough map of the immediate area sur-

State *v.* Brandon

rounding the bar and asked the defendant to indicate where he parked. The defendant pointed to a spot on the map that placed his car immediately behind where the victim's car had been parked, "bumper to bumper," as LaMaine described it. Both LaMaine and Curet then emphasized to the defendant that, according to his current account, he was the only person, other than the victim, in the vicinity when the victim was shot—that meant that he was the one who shot the victim.

At that point, the defendant stated that he was not alone. He now claimed that a person named Outlaw, who also had been gambling at the Jamaican Gambling Club that afternoon, had accompanied him when he left the club. He said that Outlaw rode in the passenger seat. According to the defendant, when he stopped his car at Robin's, Outlaw jumped out of the car, saying that he was going to get money that the victim owed him. At that time, the defendant had opened his door on the driver's side, and cracked a cigar open, emptied it, then rolled a blunt in it. While he was still rolling his blunt, the defendant heard multiple gunshots. Outlaw got back into the car. The defendant dropped him off a short distance from Robin's, on Connecticut Avenue, and then drove away.

Both LaMaine and Curet expressed doubts regarding the veracity of the defendant's story. The officers told him that he had not adequately explained why, if the victim owed Outlaw money, Outlaw had made no attempt to recover the debt while he and the victim were both at the Jamaican Gambling Club, particularly given that the victim had won a significant amount of cash over the course of the afternoon.

Nevertheless, LaMaine then asked the defendant for Outlaw's real name, his address, his phone number, and his physical description. The defendant claimed not to know Outlaw's real name or his address. At LaMaine's

State *v.* Brandon

request, the defendant scrolled through his contacts on his cell phone for Outlaw's information, then read the phone number out loud to LaMaine. He also provided the police with a physical description of Outlaw. Although LaMaine and Curet continued to call into question the defendant's account of the events of that evening, the defendant insisted that Outlaw had been present at the scene and had shot the victim. At the end of the interrogation, LaMaine informed the defendant that, because he had indicated that he communicated with Outlaw on his phone, the police were seizing the defendant's cell phone. Also at the end of the interrogation, the defendant agreed to come to the police station for a second interview, in order to identify Outlaw from photographs drawn from the police department's database. The defendant left the interrogation without being placed under arrest.

The second interrogation took place on the same day, at about 6 p.m., in an interrogation room at the Bridgeport police station. At the outset of the interview, Detective Robert Winkler and Curet advised the defendant of his rights pursuant to *Miranda*. During the second interview, Winkler, LaMaine and Curet obtained some additional details from the defendant. For example, the defendant explained that the initial amount that he and the victim wagered was $500, but, after they discovered that one side of the keys said "E55" and the other side said "E550," the defendant offered to accept $100. He also told the police officers that the coat he was wearing during the interview was the same coat he wore on the night of the shooting.[10] Additionally, he identified a photograph of Troy Lopes as the person known to him as Outlaw. For the most part, however, during the second interview, the police officers asked the defendant to review the account he had provided to them during the first interview. At the end of the

_____

[10] Because of the defendant's claim, the officers seized his coat.

interview, the defendant left without being placed under arrest.

Two days after the first two interviews, the defendant initiated the third interview, which took place in an unmarked police car in the parking lot of a Burger King in Stratford. LaMaine and Curet sat in the front seats. The defendant sat in the back seat. The defendant claimed that he feared for his safety because Outlaw had contacted him regarding the defendant's cooperation with the police. When LaMaine and Curet questioned him regarding contradictions in his story implicating Outlaw in the shooting death of the victim, the defendant asked, "[d]o I need to just go get a fucking lawyer?" Rather than clarifying whether the defendant was invoking his right to counsel, LaMaine and Curet continued questioning him. Eventually, the defendant exited the car, thus ending the interview. He left without being placed under arrest.

Prior to trial, the defendant moved to suppress his statements in all three interviews. The defendant argued that the first interview was a custodial interrogation and that the officers violated his rights by failing to provide him with *Miranda* warnings prior to the interview. Relying on his argument that the first interrogation was custodial, the defendant challenged the admission of the second interview on the basis that it violated the rule set forth in *Missouri* v. *Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004). Specifically, in *Seibert*, the United States Supreme Court held that the provision of *Miranda* warnings midstream, after a suspect had provided a confession during a custodial interrogation, violated the constitutional requirements safeguarded by *Miranda*. See id., 604 (opinion announcing judgment). The trial court denied the defendant's motion to suppress the statements that he made during his first and second interviews. See footnote 2 of this opinion.

State *v.* Brandon

Pertinent to the issues presented in this appeal, the trial court made the following rulings. As to the first interview, the court concluded that, although it was an interrogation, a reasonable person in the defendant's position would not have believed that he was in custody. In arriving at that conclusion, the court reviewed the totality of the circumstances and emphasized the following: the interrogation lasted only ninety minutes; the police did not physically restrain the defendant at any time and did not brandish their weapons; LaMaine, whose testimony the court credited, characterized the interrogation as cordial; the police told the defendant multiple times that he was free to leave; and, in fact, at the end of the interrogation, the defendant left. As to the second interview, the court explained, because the first interrogation was not custodial, *Seibert* was inapplicable, and, therefore, the defendant's challenge with respect to the second interrogation failed as well.

"[T]he standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] . . . our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts [found by the trial court] . . . ." (Internal quotation marks omitted.) *State* v. *Jackson*, 304 Conn. 383, 394, 40 A.3d 290 (2012).

This court previously has summarized the principles that govern our review of this issue. "To establish enti-

State *v.* Brandon

tlement to *Miranda* warnings . . . [a] defendant must satisfy two conditions, namely, that (1) he was in custody when the statements were made, and (2) the statements were obtained in response to police questioning.'' *State* v. *Mangual*, 311 Conn. 182, 192, 85 A.3d 627 (2014). ''The defendant bears the burden of proving custodial interrogation.'' (Internal quotation marks omitted.) *State* v. *Jackson*, supra, 304 Conn. 417. As we noted, only the question of whether the defendant was in custody during the first interrogation is before us in this appeal.

''Although [a]ny [police] interview of [an individual] suspected of a crime . . . [has] coercive aspects to it; *Oregon* v. *Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977); only an interrogation that occurs when a suspect is in custody heightens the risk that statements obtained therefrom are not the product of the suspect's free choice. *Dickerson* v. *United States*, 530 U.S. 428, 435, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000). This is so because the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements . . . .'' (Internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 191.

In *Miranda*, the United States Supreme Court defined a custodial interrogation as ''questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'' *Miranda* v. *Arizona*, supra, 384 U.S. 444. Subsequently, the court has significantly narrowed the meaning of a restraint on freedom of action or movement. See, e.g., C. Weisselberg, ''Mourning *Miranda*,'' 96 Cal. L. Rev. 1519, 1540–42 (2008). In *California* v. *Beheler*, 463 U.S. 1121, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983), the court limited the category of restraints on freedom of movement to those ''of the degree associated with a formal arrest.'' Id., 1125. The court has rejected the proposition that an interrogation of a suspect in a police station, an office of probation, or

State *v.* Brandon

even of an incarcerated person in a prison, is necessarily custodial. See, e.g., *Howes* v. *Fields*, 565 U.S. 499, 502, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012) (prison); *Maryland* v. *Shatzer*, 559 U.S. 98, 112–13, 130 S. Ct. 1213, 175 L. Ed. 2d 1045 (2010) (prison); *Minnesota* v. *Murphy*, 465 U.S. 420, 433, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984) (office of probation); *Oregon* v. *Mathiason*, supra, 429 U.S. 495 (police station). Rather, the paramount consideration for whether a suspect is in custody is whether the circumstances can "fairly be characterized as the functional equivalent of formal arrest"; *Berkemer* v. *McCarty*, 468 U.S. 420, 442, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984); or, put another way, "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."[11] *Howes* v. *Fields*, supra, 509.

"As used in . . . *Miranda* [and its progeny], custody is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. [Id., 508–509]. In determining whether a person is in custody in this sense . . . the United States Supreme Court has adopted an objective, reasonable

---

[11] Any doubt regarding whether the court in *Howes*, by referring to the "type of station house questioning at issue in *Miranda*"; *Howes* v. *Fields*, supra, 565 U.S. 509; referred to an inquiry as to whether the petitioner was restrained to a degree associated with a formal arrest is resolved by referring to the *Miranda* decision itself, which summarized the circumstances of the petitioners in the cases that were before the court in that appeal. Specifically, Ernesto Miranda was arrested, then taken to the police station, where he was interrogated. *Miranda* v. *Arizona*, supra, 384 U.S. 491. Although Michael Vignera was not arrested prior to the start of his interrogation, he was initially picked up by the police, brought in for questioning, placed under formal arrest during the course of the interrogation, then transferred to another precinct, where the interrogation continued. Id., 493. Carl Calvin Westover was arrested, placed in a lineup, booked, and then detained and interrogated over the course of two days. Id., 494–95. Finally, Roy Allen Stewart was arrested at his home, consented to a search of the home, jailed (along with his wife and three other persons who were visiting his home at the time), and interrogated over the course of five days. Id., 497.

State *v.* Brandon

person test . . . the initial step [of which] is to ascertain whether, in light of the objective circumstances of the interrogation . . . a reasonable person [would] have felt [that] he or she was not at liberty to terminate the interrogation and [to] leave. . . . [Id., 509]. Determining whether an individual's freedom of movement [has been] curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of *Miranda.* [Accordingly, the United States Supreme Court has] decline[d] to accord talismanic power to the freedom-of-movement inquiry, *Berkemer* [v. *McCarty,* supra, 468 U.S. 437], and [has] instead asked the additional question [of] whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda.* . . . *Howes* v. *Fields*, supra, [565 U.S.] 509.'' (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 193.

In other words, ''[o]nce the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.'' (Internal quotation marks omitted.) *J. D. B.* v. *North Carolina*, 564 U.S. 261, 270, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011). Put simply, it is not enough that a reasonable person under the circumstances would not have thought that he was free to leave. As one court has explained, ''[u]nder *Berkemer* [v. *McCarty*, supra, 468 U.S. 420], the question [in a custody inquiry] is *not* whether a reasonable person would believe he was not free to leave, [but] rather whether such a person would believe he was in police custody of the degree associated with formal arrest.'' (Emphasis in original; internal quotation marks omitted.) *Bates* v. *United States*, 51 A.3d 501, 510 n.22 (D.C. 2012). ''Any lesser restriction

State *v.* Brandon

on a person's freedom of action is not significant enough to implicate the core fifth amendment concerns that *Miranda* sought to address.'' *State* v. *Mangual*, supra, 311 Conn. 194–95.

In *Mangual*, this court identified the following, non-exhaustive list of factors to consider in evaluating the totality of the circumstances to determine whether a defendant has satisfied his burden of establishing that he was in custody for purposes of *Miranda:* ''(1) the nature, extent and duration of the questioning; (2) whether the [defendant] was handcuffed or otherwise physically restrained; (3) whether [law enforcement] officers explained that the [defendant] was free to leave or not under arrest; (4) who initiated the encounter; (5) the location of the interview; (6) the length of the detention; (7) the number of officers in the immediate vicinity of the questioning; (8) whether the officers were armed; (9) whether the officers displayed their weapons or used force of any other kind before or during questioning; and (10) the degree to which the [defendant] was isolated from friends, family and the public.'' Id., 197.

With these principles in mind, we examine the totality of the circumstances to determine whether the defendant was in custody during the first interrogation. It is undisputed that the defendant was neither handcuffed nor placed under formal arrest at any point prior to or during the first police interrogation. Thus, the question is whether the police otherwise restrained him to a degree associated with a formal arrest; that is to say, was his restraint the functional equivalent of a formal arrest? Assessing all the circumstances, we conclude that a reasonable person would not have believed that he was restrained to such a degree.

It is undeniable that the defendant was questioned in a coercive environment. Two armed police officers

State *v.* Brandon

conducted the interrogation in a secured area in the
probation office, immediately after the defendant had
finished his required meeting with his probation officer.
Additionally, it appears that no one told the defendant
that the individuals waiting to speak to him were police
officers. During the interrogation, the officers made it
clear to the defendant that he was their prime suspect.
Finally, at the end of the interrogation, the officers
seized the defendant's cell phone.

As we explained in our review of the controlling
principles, however, a coercive environment, without
more, does not establish that an interrogation was cus-
todial.[12] The United States Supreme Court has stated

[12] Two premises underlying the dissent's argument are contrary to the
legal principles that govern the custody analysis. First, the dissent presumes
that, because there were some coercive aspects of this interrogation, the
defendant was in custody. Second, the dissent devotes little of its analysis
to the ultimate inquiry of whether there was a formal arrest or restraint to
a degree associated with a formal arrest and, instead, treats the initial
inquiry, whether a reasonable person would have felt free to leave, as
sufficient to establish that the defendant was in custody. Essentially, the
dissent inappropriately collapses the free to leave inquiry with the restraint
to the degree associated with a formal arrest inquiry. See, e.g., *Berkemer*
v. *McCarty*, supra, 468 U.S. 435–37, 440 (declining to accord free to leave
inquiry "talismanic power" and holding, instead, that *Miranda* safeguards
are triggered when suspect's freedom is curtailed to degree associated with
formal arrest); *People* v. *Begay*, 325 P.3d 1026, 1029–30 (Colo. 2014) ("Under
the [f]ourth [a]mendment, a seizure occurs when a reasonable person would
not have felt free to leave or otherwise terminate an encounter with law
enforcement. . . . [W]hat constitutes custody for *Miranda* is narrower than
what constitutes a seizure . . . . [T]he [*Miranda*] question is *not* whether
a reasonable person would believe he was not free to leave, but rather
whether such a person would believe he was in police custody of the degree
associated with a formal arrest." (Citations omitted; emphasis in original;
internal quotation marks omitted.)); see also, e.g., 2 W. LaFave et al., Criminal
Procedure (4th Ed. 2015) § 6.6 (c), pp. 810–11.

The dissent's discussion of the police officers' threats to arrest the defen-
dant at some point in the future illustrates these flaws in its analysis. The
dissent claims: "It cannot seriously be maintained that a threat by the interro-
gating officers to arrest a suspect in the near future, but not right now,
unless the suspect remains and answers questions will have no significant
impact on the person's perception that he is truly free to leave." Although
such threats may have an effect on a reasonable person's perception that

State *v.* Brandon

that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system [that] may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question." *Oregon* v. *Mathiason*, supra, 429 U.S. 495. The ultimate inquiry in a custody determination is always "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." (Internal quotation marks omitted.) *Yarborough* v. *Alvarado*, 541 U.S. 652, 662, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004). Our review of the facts persuades us that the coercive elements of the interrogation were offset by other factors and did not rise to the degree of restraint associated with a formal arrest.

In summary, we conclude that, notwithstanding the coercive elements of the interrogation, the following facts demonstrate that the defendant was not restrained

he is free to leave, overemphasizing those threats suggests that the answer to the free to leave prong of the custody inquiry is dispositive of the question of whether the restraint on the defendant was to the heightened degree necessary for custody. Concluding that the defendant was restrained to a degree associated with a formal arrest because the officers threatened to seek a warrant for his future arrest simply cannot be squared with the facts that he was not ordered to report to the meeting, he was told repeatedly that he could leave, he was not handcuffed or otherwise physically restrained, the interrogation was cordial, and the officers allowed him to scroll through his phone during the interrogation. Indeed, in this particular case, at no point during the interview did either LaMaine or Curet suggest that the defendant would be placed under arrest as an immediate and direct consequence of terminating the interview. In fact, they made the opposite quite clear. Specifically, LaMaine told the defendant, "[n]othing you say is going to get you arrested today," and that, if he wanted to, he could "walk away right now . . . ." They informed the defendant—seven separate times— either that he was free to leave or that he was not under arrest. Those advisements weigh heavily against a conclusion that a reasonable person would have felt that he was restrained to a degree associated with a formal arrest.

State *v.* Brandon

to the degree associated with a formal arrest and, therefore, was not in custody during the interrogation. The record does not reveal that Calixte ordered the defendant to meet with the police officers. Instead, according to Calixte's uncontroverted testimony at the suppression hearing, following the conclusion of the defendant's mandatory meeting with her, she informed the defendant that, "if he had a moment," he could meet with "someone else" who wished to speak with him. The defendant did not introduce any evidence that he objected to the meeting, told Calixte that he did not have time, or asked her if he was obligated to go despite her clear statement that their mandatory meeting was over. The defendant could have left. He did not. There is no indication in this record that Calixte would not have honored the defendant's request if he said he did not have a moment and declined to attend the meeting.

Simply being on probation is insufficient to render any request from one's probation officer coercive. See, e.g., *United States* v. *Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) (considering fact that probation officer did not tell defendant that he was obligated to speak with law enforcement officers as weighing against conclusion that defendant was in custody), cert. denied, 516 U.S. 1182, 116 S. Ct. 1284, 134 L. Ed. 2d 229 (1996). As we explain hereinafter, in order to support his claim that his status as a probationer created a level of coercion that compels the conclusion that he was in custody, the defendant had to demonstrate that Calixte ordered him to attend the meeting.[13] He failed to make that showing.

_____

[13] The dissent acknowledges that the defendant failed to produce any evidence either that Calixte ordered the defendant to attend the meeting with the police officers or that she threatened him with a violation of probation if he refused. Contrary both to applicable precedent and the allocation of the burden of proof, the dissent reasons that, because the record is ambiguous as to whether Calixte informed the defendant that he was not required to attend, we should infer that a reasonable person in the defendant's position would have believed that she commanded him to attend

State *v.* Brandon

In fact, after Calixte told him that the mandatory meeting was over, and that he could meet with the waiting persons "if he had a moment," the defendant accompanied Calixte to meet with the unidentified persons. Upon seeing that the individuals who were waiting for him were members of law enforcement, the defendant elected to remain in Bunosso's office. The defendant did not end the ninety minute interrogation, notwithstanding the repeated reminders from the police officers that he was free to leave and was not under arrest. The officers did not handcuff the defendant, physically threaten him, or attempt to physically restrain him or otherwise restrict his movement. The tone of the interrogation was not hostile. Although the officers seized his cell phone at the end of the interrogation, the defendant was able to freely use his phone during the interrogation, specifically, when, midway through the interrogation, he accessed, from his cell phone contacts, the phone number for "Outlaw," the man he accused of committing the crime. Finally, at

the meeting. As we explained, the defendant bears the burden of proving custody. *State* v. *Jackson*, supra, 304 Conn. 417. It defies logic, when confronted with an ambiguous record, to draw the inference favorable to the party who bears the burden of proof.

Furthermore, controlling precedent is clear—because "the [s]tate could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the [f]ifth [a]mendment privilege," in the absence of an order from his probation officer, a probationer's fear of revocation of probation for "refusing to answer questions calling for information that would incriminate [him or her] in separate criminal proceedings" is unreasonable and, therefore, does not support the inference that the probationer was coerced. *Minnesota* v. *Murphy*, supra, 465 U.S. 438. Following *Murphy*, the United States courts of appeals have held that, without more, the mere fact that a probation officer requested a defendant to attend a meeting with law enforcement officers does not render an interrogation custodial. Compare *United States* v. *Cranley*, 350 F.3d 617, 618–19 (7th Cir. 2003) (interrogation by federal agent at probation office, arranged by probation officer, was not custodial), with *United States* v. *Ollie*, 442 F.3d 1135, 1138, 1140 (8th Cir. 2006) (defendant was in custody when parole officer ordered him to report for questioning by police chief in police station, and parole officer testified that defendant's failure to comply would have been violation of parole).

State *v.* Brandon

the end of the interrogation, the defendant left without
being placed under arrest and agreed to meet with the
officers again, later that same day, at the police station.
Our review of the various *Mangual* factors only fortifies
our conclusion that the defendant was not restrained
to a degree associated with a formal arrest. We discuss
those various *Mangual* factors in greater detail indi-
vidually.[14]

Turning to the first *Mangual* factor, we begin with
the trial court's finding that the tone and tenor of the
interrogation were cordial. The trial court stated, during
the suppression hearing, that it had reviewed the audio
and video recordings of the three interrogations. The
court's factual finding, therefore, is based on its own
review of the evidence, as well as its finding that
LaMaine's testimony that the first interrogation was
cordial was credible. We defer to the credibility findings
of the trial court. See, e.g., *Jones* v. *State*, 328 Conn.
84, 101, 177 A.3d 534 (2018).

Moreover, to the extent that the trial court's finding
regarding the tone of the interrogation is predicated
on its own review of the audio recording of the first
interview, that finding is equally entitled to deference.
See, e.g., *State* v. *Griffin*, 339 Conn. 631, 669, 262 A.3d
44 (2021) ("[a] trial court's findings are entitled to defer-
ence, even if they are predicated on documentary evi-
dence that this court is equally able to review for itself
on appeal"), cert. denied,       U.S.    , 142 S. Ct. 873,
211 L. Ed. 2d 575 (2022); see also, e.g., *State* v. *Lawrence*,

---

[14] Contrary to the dissent's suggestion, we do not apply these factors as
a mechanical test, the satisfaction of which automatically satisfies custody.
Indeed, as we pointed out, we have little difficulty applying the general
principles laid out by the United States Supreme Court and concluding that
the defendant has not demonstrated that the circumstances here rose to
the level of restraint associated with a formal arrest. Still, we find that
reviewing the *Mangual* factors helps to provide a more fulsome examination
of the circumstances of the first interrogation.

State *v.* Brandon

282 Conn. 141, 157, 920 A.2d 236 (2007) ("it would be improper for this court to supplant its credibility determinations for those of the fact finder, regardless of whether the fact finder relied on the cold printed record to make those determinations").

Consistent with the trial court's finding, we note, from our own review of the recording of the first interrogation, that at no point during that interrogation did either of the police officers raise their voices. Courts have noted that such a tone and tenor weigh against a conclusion that a defendant was in custody. See, e.g., *United States* v. *Guerrier*, 669 F.3d 1, 5–6 (1st Cir. 2011) (in concluding that interview in unmarked police car with parole officer and two members of law enforcement was not custodial, "relatively calm and nonthreatening" nature of questioning weighed against finding that defendant was in custody); see also, e.g., *United States* v. *Edrington*, 851 Fed. Appx. 574, 577 (6th Cir. 2021) ("consensual tone and tenor of the meeting [with the defendant's probation officer and federal agents] weigh[ed] against a finding of custody" (internal quotation marks omitted)).

The duration of the interrogation, ninety minutes, also weighs against a conclusion that the defendant was in custody in the present case. Indeed, this court has concluded that an interview of two and one-half hours did not "necessitate the conclusion that a reasonable person would believe [the defendant] could not leave, particularly in light of the repeated reminders he received that he was free to leave at any time." *State* v. *Pinder*, 250 Conn. 385, 414, 736 A.2d 857 (1999). Other courts also have considered an interview of this length to weigh against a conclusion that a defendant was in custody. See, e.g., *Stechauner* v. *Smith*, 852 F.3d 708, 715–16 (7th Cir.) (ninety minute interview "was relatively short"), cert. denied, U.S. , 138 S. Ct. 194, 199 L. Ed. 2d 130 (2017); *United States* v. *Galceran*, 301

State *v.* Brandon

F.3d 927, 931 (8th Cir. 2002) ("the ninety-eight minute length of the interview [did] not indicate police domination"). But see, e.g., *United States* v. *FNU LNU*, 653 F.3d 144, 154–55 (2d Cir. 2011) (although court ultimately concluded that defendant was not in custody, interview's duration of ninety minutes was among factors that weighed in favor of finding of custody). The duration of the interrogation was the same as that of the detention. Accordingly, the sixth *Mangual* factor, the length of the detention, also weighs against concluding that the defendant was in custody. See *State* v. *Pinder*, supra, 414.

We next consider the second, seventh, eighth and ninth *Mangual* factors, which, when viewed together, weigh against a conclusion that the defendant was restrained to a degree associated with a formal arrest. There were only two police officers in the interrogation room. The defendant was neither handcuffed nor physically restrained in any way. There is also no evidence that, if the defendant had sought to move, the officers would have restricted his movement. In fact, the defendant sat closest to the door. As we observed, there was no testimony regarding the size of the office. Nor was there testimony as to whether the door was locked. There was no evidence regarding where the officers were in relation to the defendant, other than that they were farther away from the door than the defendant. It was the defendant's burden to establish those facts in support of his claim. He failed to present any evidence that the circumstances within the room created an atmosphere similar to that associated with the station house interrogations at issue in *Miranda*. Although both officers were armed, were equipped with handcuffs, and wore visible badges, neither of them physically threatened the defendant, used force, handcuffed him, or brandished their weapons.[15]

---

[15] We fully appreciate that there may be circumstances in which the presence of two law enforcement officers could weigh in favor of finding that

State *v.* Brandon

Turning to the third *Mangual* factor, we consider it significant that, in the present case, after the first twenty-one minutes of the interrogation, LaMaine and Curet repeatedly advised the defendant that he was free to leave and that he was not under arrest. Courts have held that these advisements weigh heavily against the conclusion that a defendant was in custody for purposes of *Miranda*. See, e.g., *Howes* v. *Fields*, supra, 565 U.S. 515 (''[m]ost important, [the defendant] was told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted''); *United States* v. *Roberts*, 975 F.3d 709, 716 (8th Cir. 2020) (informing suspect that he is free to terminate interview is ''powerful evidence that a reasonable person would have understood that he was free to terminate the interview'' (internal quotation marks omitted)), cert. denied,      U.S.    , 141 S. Ct. 2822, 210 L. Ed. 2d 942 (2021); *United States* v. *Martinez*, 795 Fed. Appx. 367, 371 (6th Cir. 2019) (''[w]hether investigators inform a suspect that he is free to leave or to refuse to answer questions is the most important consideration in the *Miranda* custody analysis''); *United States* v. *Ollie*, 442 F.3d 1135, 1138 (8th Cir. 2006) (Advisement provided to the defendant, that he was not under arrest, somewhat mitigated custodial

a defendant was in custody. As with every factor in the custody inquiry, however, the defendant bears the burden of proving that the number of officers present weighs in favor of a custody finding. The defendant has not, however, demonstrated that the room was particularly small, that the officers flanked him, stood over him, or sat overly close to him, or that the two officers somehow used their numbers to restrict his movements in any way. In the absence of any such showing, we conclude that the rather routine number—two law enforcement officers—weighs against a conclusion that the defendant was in custody. See, e.g., *United States* v. *Woody*, 45 F.4th 1166, 1175 (10th Cir. 2022) (presence of two officers, without more, was insufficient to demonstrate that reasonable person would not have felt free to decline to speak with officers); *State* v. *Castillo*, 329 Conn. 311, 333, 186 A.3d 672 (2018) (rejecting defendant's contention that presence of three officers in his living room weighed in favor of concluding that he was in custody).

State *v.* Brandon

nature of the interview, but "an explicit assertion that the person may end the encounter is stronger medicine. Such a statement provides an individual with a clear understanding of his or her rights and generally removes any custodial trappings from the questioning.").

Despite those repeated advisements, the defendant chose to remain. Indeed, not once during the interrogation did the defendant ask to leave. See, e.g., *State* v. *Lapointe*, 237 Conn. 694, 727, 678 A.2d 942 (defendant's failure to ask to leave weighed against finding of custody), cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996). We agree with the United States Court of Appeals for the Eighth Circuit, which observed: "Against a backdrop of repeated advice that he was free to terminate the interview, [a defendant's] decision not to terminate the interview and to allow the interview to proceed to its closing suggests an exercise of free will, rather than restraint to a degree associated with formal arrest." *United States* v. *Czichray*, 378 F.3d 822, 829 (8th Cir. 2004), cert. denied, 544 U.S. 1060, 125 S. Ct. 2514, 161 L. Ed. 2d 1109 (2005).

Certainly, if LaMaine had informed the defendant at the outset of the interrogation that he was not under arrest or that he was free to leave, these advisements would have weighed even more heavily in favor of concluding that the defendant was not in custody.[16] By the

---

[16] We disagree with the dissent's suggestion that the delay in advising the defendant that he was free to leave and was not under arrest until after he had incriminated himself is somehow analogous to the midstream *Miranda* warnings condemned in *Missouri* v. *Seibert*, supra, 542 U.S. 604 (opinion announcing judgment), and that the police officers' advisements to the defendant that he was free to leave therefore have no place in the custody analysis in the present case because they "fail to convey to a suspect that he has a choice regarding his participation in the interrogation." The dissent has cited no support for this proposition. Our case law supports the opposite conclusion. Two cases in particular are instructive.

In *State* v. *Pinder*, supra, 250 Conn. 385, this court rejected the defendant's claim that the admission of inculpatory statements he made to polygraph examiners violated his fifth amendment right against self-incrimination under *Miranda*. Id., 408. Specifically relevant to the present case, the defen-

State *v.* Brandon

time that LaMaine first informed the defendant that he was free to leave, the defendant already had implicated himself by claiming, in direct contradiction to his earlier representations, that he drove past the crime scene within minutes of the shooting. We appreciate that the provision of these advisements would have been even more effective had the police officers given them at the start of the interrogation. The timing of these advisements in the present case, however, does not eliminate the powerful effect of LaMaine's direct advisements: "[y]ou can walk away right now if you want"; "[y]ou can leave right now if you want"; "[n]othing you say is going to get you arrested today"; and "[y]ou're free to go." Under most circumstances, it would be difficult to conclude that a reasonable person, upon hearing those words, would nonetheless feel restrained to a degree associated with a formal arrest.

Indeed, we note that, although the provision of these advisements weighs heavily against concluding that a

dant in *Pinder* contended that, after he told examiners that he had assisted the victim in committing suicide, he was in custody for purposes of *Miranda*. See id., 414. This court rejected that argument, emphasizing that the examiners did not, in response to the defendant's inculpatory statement, "[alter] the circumstances of their interviews of the defendant in such a way that his initial noncustodial status became custodial." (Internal quotation marks omitted.) Id., 415–16; see also *State* v. *Lapointe*, supra, 237 Conn. 727 (defendant's statements implicating himself in crime did not render interviews custodial because police did not alter circumstances of interviews following his admissions).

Similar to *Pinder* and *Lapointe*, in the present case, the police officers did not alter the circumstances of the interview following the defendant's incriminating statements. In fact, they informed him that he was free to leave or that he was not under arrest—seven times. The dissent's argument that, after he made incriminating statements, the defendant may not have felt free to leave because, in effect, the cat was out of the bag, misses the point of the custody inquiry. The question is not whether the defendant deemed it a good strategic decision to leave. Rather, the question is whether a reasonable person in the defendant's position would have believed that his freedom of movement was constrained to the degree associated with a formal arrest.

State *v.* Brandon

defendant was in custody for purposes of *Miranda*, the failure to provide them, or, as in the present case, a delay in providing them, does not necessitate the opposite conclusion. This court has, in fact, recognized that, as long as the facts demonstrate that a reasonable person in the defendant's position would understand that his meeting with law enforcement is consensual, a defendant need not be "expressly informed that he [is] free to leave" in order for a court to conclude that the defendant has failed to prove that an interrogation was custodial. *State* v. *Greenfield*, 228 Conn. 62, 72 n.10, 634 A.2d 879 (1993); see, e.g., id., 71–72 n.10 (although police did not expressly inform defendant that he was free to leave, trial court could reasonably have found, given facts of case, that defendant understood that meeting was consensual); see also, e.g., *United States* v. *Ingino*, 845 Fed. Appx. 135, 138 n.1 (3d Cir. 2021) ("[a]lthough the [state] troopers did not explicitly tell [the defendant] he was 'free to leave,' they did not have to speak magic words for it to be clear that he was not under arrest and was free to leave").

Drawing the conclusion that an interrogation was custodial from the failure to advise—or, in the present case, a delay in advising—a defendant that he is free to leave or not under arrest misunderstands the two-pronged nature of the *Miranda* custody inquiry. As the United States Supreme Court has explained, to establish custody, a defendant must prove both that a reasonable person would not have felt free to terminate the interview or to leave; see *Yarborough* v. *Alvarado*, supra, 541 U.S. 663; and that "there is a formal arrest or restraint on [the] freedom of movement of the degree associated with a formal arrest." (Internal quotation marks omitted.) Id., 662. Accordingly, establishing that a reasonable person would not have felt free to leave is a necessary, but not a sufficient, condition to satisfy the defendant's burden of proving that his interrogation

State *v.* Brandon

was custodial. See, e.g., *Howes* v. *Fields*, supra, 565 U.S. 509 ("[o]ur cases make clear . . . that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody" (internal quotation marks omitted)); see also, e.g., *State* v. *Powers*, 203 Vt. 388, 405, 157 A.3d 39 (2016) (observing, in context of interrogation in probation office, that fact that probationer was not free to leave was necessary, but not sufficient, condition of custody).

Indeed, the cases in which courts have concluded, notwithstanding law enforcement officers' statements to a defendant that he was free to leave, that a defendant was subjected to custodial interrogation, typically have involved extreme circumstances that compelled the conclusion that the defendant was in custody; none of which exist in the present case.[17] See, e.g., *United States* v. *Newton*, 369 F.3d 659, 675–77 (2d Cir.) (defendant was in custody, despite being told that he was not under arrest, when he was handcuffed after six law enforce-

_____

[17] The dissent asserts that "free to leave advisements must be assessed in light of the surrounding circumstances . . . ." Footnote 11 of the dissenting opinion. We agree and have done so. The dissent's attempt to deem the advisements in the present case ineffectual, however, cannot be squared with even the precedent it cites for that proposition. Specifically, the decisions cited by the dissent illustrate that the circumstances in the present case do not involve the type of extreme circumstances under which courts have concluded that, notwithstanding law enforcement officers' advisement to a defendant that he was free to leave, the interrogation was nevertheless custodial. See *United States* v. *Hashime*, 734 F.3d 278, 284 (4th Cir. 2013) (The defendant was in custody despite being told by the police that he was free to leave, when the defendant "had awoken at gunpoint to a harrowing scene: his house was occupied by a flood of armed officers who proceeded to evict him and his family and restrict their movements once let back inside. Throughout the interrogation, [the defendant] was isolated from his family members, with his mother's repeated requests to see him denied."); *United States* v. *Craighead*, 539 F.3d 1073, 1078, 1087–89 (9th Cir. 2008) (defendant was in custody despite being told that he was free to leave when eight armed law enforcement officers wearing flak jackets, some of whom unholstered their weapons, executed search warrant for defendant's home while defendant was interrogated in storage room with closed door, guarded by law enforcement officer).

State *v.* Brandon

ment officers entered his apartment and he remained handcuffed during entire interrogation), cert. denied, 543 U.S. 947, 125 S. Ct. 371, 160 L. Ed. 2d 262 (2004); see also, e.g., *United States* v. *McKany*, 649 Fed. Appx. 553, 554–55 (9th Cir. 2016) (defendant was in custody at time of interrogation, notwithstanding being told he was free to leave or to terminate interview, when law enforcement officers entered his home at 6:30 a.m. in full tactical gear and with weapons drawn, fourteen officers were ultimately involved in executing search warrant, and defendant was handcuffed and escorted to bathroom prior to interrogation and then isolated from others during interrogation).

In the present case, at the end of the interrogation, consistent with the repeated advisements that he was free to leave, the defendant left without being placed under arrest. This fact weighs against the conclusion that the defendant was restrained to the degree associated with a formal arrest. See, e.g., *United States* v. *Galceran*, supra, 301 F.3d 931 ("[l]ack of arrest is a 'very important' factor weighing against custody"). The United States Supreme Court has explained why this particular factor is relevant to the custody inquiry: the "release of the [suspect] at the end of the questioning" is one of the factors relevant to the determination of how a suspect would have gauged his freedom of movement—that factor, therefore, bears on whether a reasonable person would have felt free to leave during the interview. *Howes* v. *Fields*, supra, 565 U.S. 509; see also, e.g., *Oregon* v. *Mathiason*, supra, 429 U.S. 495 (defendant was not in custody when, "[a]t the close of a [one-half hour] interview [the defendant] did in fact leave the police station without hindrance"). Indeed, this court also has considered the fact that a defendant was permitted to leave at the conclusion of an interrogation as a factor weighing against a finding that the defendant was in custody. *State* v. *Lapointe*, supra, 237

State *v.* Brandon

Conn. 727, 733–34 (fact that defendant was allowed to leave upon completion of interviews, which lasted for more than eight hours, weighed against finding of custody).[18]

Because the police initiated the encounter, the fourth *Mangual* factor weighs modestly in favor of a conclusion that the defendant was in custody. Its weight is undercut, however, by the defendant's acquiescence to the meeting. Specifically, although the police initiated the encounter by making arrangements with the probation office and no one informed the defendant in advance that the individuals waiting for him were members of law enforcement, the defendant was not ordered to meet with them, and, when he discovered that the individuals were police officers, he chose to stay. Calixte testified that, although she could not recall the precise words she used, she disagreed that the substance of what she said to the defendant was: "[C]ome with me, you're going to see my supervisor now." Instead, she testified that she "basically let him know the office visit was concluded. We were done, and we were walking downstairs, but, if he had a moment, he [could] speak to someone else who would like to talk to him." The defendant accompanied Calixte, then Bunosso, to Bunosso's office, where LaMaine and Curet waited. There is no evidence in the record that the defendant objected to accompanying Calixte to Bunosso's office.

What is clear on this record is that Calixte did not order the defendant to meet with the individuals who

---

[18] We acknowledge the tension with placing significant weight on this factor given that a suspect may not know at the outset of or during a particular interrogation whether he will be permitted to leave at the end of the interrogation. However, both the United States Supreme Court and this court have considered this factor in the totality of the circumstances that bear on a custody determination. Thus, although we do not place great weight on this factor, we nevertheless consider it in accordance with long-standing, established precedent in this area.

State *v.* Brandon

waited for him. The lack of coercion in the language that Calixte used to ask the defendant if he was willing to attend the meeting supports the conclusion that a reasonable person in the defendant's position would not have felt restrained to a degree associated with a formal arrest.[19] See, e.g., *Howes* v. *Fields*, supra, 565 U.S. 514 (language used to summon defendant is significant in custody analysis); see also, e.g., *United States* v. *Ruggles*, supra, 70 F.3d 265 (probation officer's failure to tell defendant that he was obligated to speak with law enforcement officials weighed against concluding that defendant was in custody). We believe that the language that Calixte used to frame the defendant's options more than offsets the failure to inform him that the individuals waiting for him were members of law enforcement. See, e.g., *United States* v. *Edrington*, supra, 851 Fed. Appx. 577 (probation officer's lie in summoning defendant to interrogation with federal agents "weigh[ed] only modestly in favor of custody" (internal quotation marks omitted)); see also, e.g., *United States* v. *Guerrier*, supra, 669 F.3d 4–6 (defendant was not in

---

[19] We disagree with the defendant's contention that, because Calixte was his probation officer, even if she expressly told him he had a choice, the "choice" would be meaningless due to her authority over him and the possible "repercussions" of making a wrong choice. (Internal quotation marks omitted.) First, we note that Calixte testified that, before she informed the defendant that there were people waiting to speak to him, if he had time, *she told him that their mandatory meeting was finished*. Second, as we explain in this opinion, in *Minnesota* v. *Murphy*, supra, 465 U.S. 420, the United States Supreme Court rejected the proposition that the pressure associated with the mere possibility of revocation of probation is "comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator." Id., 433. As we also explain in this opinion, courts applying *Murphy* have concluded that the threat of revocation of probation weighs in favor of finding that a defendant was in custody only when the probation officer has ordered or directed the defendant to report to an interrogation. See, e.g., *United States* v. *Ollie*, supra, 442 F.3d 1138–40. The defendant presented no evidence that Calixte ordered him to meet with anyone after his meeting with her had ended or that she threatened to report that he had violated his probation if he refused to do so.

State *v.* Brandon

custody when members of law enforcement "camped outside" probation officer's office during defendant's regular meeting but defendant "expressed no qualms about talking with them").[20]

The fifth *Mangual* factor, the location of the interview, also provides some support for the defendant's contention that he was in custody. As we observed, the questioning took place inside the building where the probation office is located. In arguing that he was in custody during the interrogation, the defendant relies on both the secure nature of the building and the requirements imposed on him as a probationer, namely, that he was required to meet with his probation officer and to comply with her orders.

Regarding the secure nature of the building, we already noted that, although the record is clear that, in order to enter the building, as well as the individual secured areas, the defendant needed to be escorted, the defendant failed to demonstrate, as was his burden, that there were any limitations placed on his ability to leave the secured areas of the building or the building itself. That is, there is no evidence in the record that the defendant had to be escorted out of the secured areas or out of the building itself. Nor did the defendant produce

___

[20] We note that, in support of his claim that he was in custody during the first interview, the defendant also relies on the fact that LaMaine and Curet misrepresented the evidence against him during the interrogation. The United States Supreme Court has stated, however, that deceptive interrogation tactics have no bearing on the *Miranda* custody analysis. Specifically, in *Oregon* v. *Mathiason*, supra, 429 U.S. 492, the United States Supreme Court observed that the Oregon Supreme Court had found that a police officer's false statement that the defendant's fingerprints had been discovered at the scene of the crime contributed to the coercive environment of the interview for purposes of *Miranda*. Id., 495. The United States Supreme Court resoundingly rejected that proposition, explaining: "Whatever relevance this fact may have to other issues in the case, it has nothing to do with whether [the defendant] was in custody for purposes of the *Miranda* rule." Id., 495–96.

State *v.* Brandon

any evidence regarding the size of Bunosso's office, or the size and structure of the surrounding area.[21]

Although the defendant's status as a probationer who was questioned in the probation office may have contributed to the coercive aspects of the interrogation, it does not transform a noncustodial interrogation into a custodial one. This precise contention has already been addressed by the United States Supreme Court and has been expressly rejected by that court and nearly every other court that has addressed this issue. In *Minnesota* v. *Murphy*, supra, 465 U.S. 420, the United States Supreme Court considered the significance, in the *Miranda* custody analysis, of the locus of an interrogation in a probation office. See id., 431–34. The court began by emphasizing the narrow scope of the concept of custody for purposes of *Miranda*. That is, in the absence of a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest," a suspect is not in custody for purposes of *Miranda*. (Internal quotation marks omitted.) Id., 430. The court likened a probationer's obligation to appear and be truthful to that of a grand jury witness. Id., 431. The grand jury witness, the court observed, is subject to more intimidating pressure than a probationer, yet the court has never held that

—————

[21] The dissent states that, "based on the undisputed facts regarding the extent of security in the building, specifically, the requirement of an escort from the entrance of the building to the defendant's meeting with Calixte and the fact that Calixte escorted the defendant to Bunosso's office, a reasonable person in the defendant's position would have believed that he could not leave without assistance." Footnote 7 of the dissenting opinion. The record is silent as to whether he could leave the building unescorted. Presumably, either Calixte or Bunosso could have resolved this question if the defendant had asked them. He did not. Accordingly, notwithstanding the dissent's assertion, we are neither making any factual findings nor "conclud[ing] with certainty" that the defendant was not able to leave the building unescorted. (Emphasis omitted.) Id. Instead, we allocate the burden where it belongs—with the defendant. He did not establish that he was unable to leave without an escort. The lack of clarity in the record does not redound to his benefit in our assessment of whether he was in custody.

State *v.* Brandon

*Miranda* warnings must be provided to a grand jury witness. Id. The mere concern that terminating the interview may result in the revocation of probation, the court added, does not render the interview custodial. See id., 433. That type and level of pressure are ''not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator.'' Id. Finally, the court observed that, because a probationer attends meetings regularly, over time, a probation office, in contrast to a police station, constitutes familiar surroundings and that familiarity provides some insulation from the ''psychological intimidation'' that characterizes a custodial interrogation. Id.

In the wake of *Murphy*, the vast majority of decisions from United States courts of appeals considering whether an interrogation conducted in a probation office or involving a probation or parole officer was custodial have answered that question in the negative. See, e.g., *United States* v. *Edrington*, supra, 851 Fed. Appx. 576–78 (defendant was not in custody when probation officer directed him to report to probation office, where defendant was interrogated for fifteen to twenty minutes by federal agents); *United States* v. *Ingino*, supra, 845 Fed. Appx. 137–38 (defendant was not in custody during thirty minute interrogation in probation office by two state troopers, following mandatory meeting with probation officer, when defendant was told he was not under arrest and troopers did not use overt coercion); *United States* v. *Guerrier*, supra, 669 F.3d 4–6 (defendant was not in custody when he was interrogated by two law enforcement officers for twenty to twenty-five minutes in unmarked police car, in presence of parole officer, following regularly scheduled meeting with parole officer); *United States* v. *Aldridge*, 664 F.3d 705, 709, 711–12 (8th Cir. 2011) (defendant was not in

State *v.* Brandon

custody when ordered by probation officer to report to courthouse, where he agreed to be questioned by federal agents, and trial court did not clearly err in finding that defendant acquiesced to questioning); *United States* v. *Rainey*, 404 Fed. Appx. 46, 55–56 (7th Cir. 2010) (defendant was not in custody when probation officer and detective brought defendant to probation office, then detectives interrogated her for sixty to ninety minutes), cert. denied sub nom. *Cobb* v. *United States*, 562 U.S. 1236, 131 S. Ct. 1512, 179 L. Ed. 2d 335 (2011), and cert. denied, 563 U.S. 950, 131 S. Ct. 2127, 179 L. Ed. 2d 917 (2011); *United States* v. *Cranley*, 350 F.3d 617, 618–19 (7th Cir. 2003) (interrogation by federal agent in probation office was not custodial); *United States* v. *Howard*, 115 F.3d 1151, 1154–55 (4th Cir. 1997) (defendant was not in custody when federal agents met him at airport, and he agreed to accompany them to probation office for questioning, insofar as, although there was no indication that defendant was told he was free to leave or not under arrest, agents did not handcuff or otherwise restrain defendant or restrict his use of phone); *United States* v. *Ruggles*, supra, 70 F.3d 264 (defendant was not in custody when probation officer scheduled same day meeting at probation office upon request of federal agent, and defendant was told "that he was free to leave, that he was not under arrest, and that he did not have to speak" to law enforcement officials).

Notwithstanding this overwhelming majority of cases, the dissent relies on the only two decisions in which courts concluded that the nexus between a defendant's interrogation and his probation status demonstrated that he was in custody for purposes of *Miranda*. Each case is easily distinguishable from the present case. Both relied on the fact that the defendant's failure to report for questioning would have resulted in a violation of probation. See *United States* v. *Barnes*, 713

State *v.* Brandon

F.3d 1200, 1204–1205 (9th Cir. 2013) (defendant was in custody when federal agents interrogated him during specially scheduled, mandatory parole meeting at probation office); *United States* v. *Ollie*, supra, 442 F.3d 1138–40 (defendant was in custody when parole officer ordered him to report for questioning by police chief in police station, defendant testified that he felt obligated to follow parole officer's order, and defendant did not acquiesce to questioning, insofar as his failure to comply would have been violation of parole).

In contrast to both *Barnes* and *Ollie*, in the present case, the defendant was not ordered to meet with law enforcement officers for questioning, and the questioning occurred only after his mandated meeting with his probation officer had ended. Indeed, there is no evidence in the present case that Calixte ever directed the defendant to attend the meeting or that she told the defendant that his probation would be violated if he refused to attend the meeting. Accordingly, we conclude that a reasonable person, under those circumstances, would not have believed that refusing to meet with the police officers would result in a violation of his probation.

One of the leading cases in this area, *United States* v. *Cranley*, supra, 350 F.3d 617, shares many factual circumstances with the present case. The court in *Cranley* concluded that, although the interrogation of the defendant, a probationer, occurred in a coercive atmosphere—the probation office—the interrogation was not custodial. Id., 618–19. The defendant's terms of probation required him to report to his probation officer as directed, for both scheduled and unscheduled meetings, and to provide truthful responses to inquiries by his probation officer. Id., 618. At the request of a federal agent, the defendant's probation officer scheduled a meeting with the defendant, so that the agent could question the defendant regarding several guns that the

agent had traced to the defendant. Id. The probation officer was present during the one hour interrogation. Id., 619. As in the present case, the interrogation took place in a secure area. Id. Subsequently, the agent met for a second time with the defendant in the same location, this time outside the presence of the probation officer and for at least ninety minutes. Id. At the conclusion of both interviews, the defendant was permitted to leave. See id.

The court recognized that the atmosphere in the probation office was coercive; see id.; but concluded that the facts of the case, as we have summarized them in the preceding paragraph, lacked the "usual indications of police custody . . . ." (Citations omitted.) Id., 620. The court also noted that, like the defendant in the present case, the defendant in *Cranley* failed to establish the character of the building, that is, whether the probation office shared the building with other offices unrelated to law enforcement, which would "mut[e] the impression that the probation service is a branch of the state correctional authority," or, by contrast, with a courthouse, a jail or police station. Id., 619–20. The court in *Cranley* considered it significant that the defendant had not asked whether he was under arrest or free to leave. See id., 620. Had he done so, the court stated, "we would know from the answer whether he was in custody." Id. Given these gaps in the record, the court concluded, *Minnesota* v. *Murphy*, supra, 465 U.S. 433, and the "long list of cases" applying *Murphy*, controlled and precluded a conclusion that the defendant was in custody. *United States* v. *Cranley*, supra, 350 F.3d 620.

A comparison of the facts of the present case and those presented in *Cranley* demonstrates that the facts in *Cranley* weighed more heavily in favor of a finding of custody than those in the present case. Specifically, in *Cranley*, there was no indication that the defendant was ever informed either that he was free to leave or

that he was not under arrest. In fact, the court noted
that, before one of the two meetings, the probation
officer reminded the defendant of his obligation to
answer questions truthfully. Id., 619.

Regarding the absence, in the record, of any evidence
that the defendant had been told he was free to leave
or was not under arrest, the court observed that the
defendant could have "asked the [federal] agent, when
the questioning got hot, '[a]m I under arrest or am I
free to leave?' Had he done that we would know from
the answer whether he was in custody. His failure to
ask, given the location of the interview and the absence
of the usual indications of police custody, precludes a
finding of custody, in light of such cases as *Minnesota*
v. *Murphy*, [supra, 465 U.S. 433]; *United States* v. *Hum-
phrey*, [34 F.3d 551, 554 (7th Cir. 1994)]; *United States*
v. *Hayden*, 260 F.3d 1062, 1066–67 (9th Cir. 2001) [cert.
denied, 534 U.S. 1151, 122 S. Ct. 1117, 151 L. Ed. 2d
1011 (2002)]; *United States* v. *Howard*, [supra, 115 F.3d
1154–55]; *United States* v. *Nieblas*, 115 F.3d 703, [704–
705] (9th Cir. 1997); and *United States* v. *Ruggles*,
[supra, 70 F.3d 264–65], all closely in point." *United
States* v. *Cranley*, supra, 350 F.3d 620.[22]

___

[22] Two additional differences between the present case and *Cranley* fur-
ther demonstrate that the defendant's interrogation was less coercive than
that of the defendant in *Cranley*. Unlike the interrogation in the present
case, the first interrogation in *Cranley* was conducted during the defendant's
scheduled meeting with his probation officer. See *United States* v. *Cranley*,
supra, 350 F.3d 618–19. Therefore, unlike the circumstances in the present
case, in *Cranley*, the probation officer required the defendant to attend
the meeting with the federal agent. See id., 618. Additionally, because the
probation officer is the person charged with ensuring that a probationer
adheres to the terms of supervised release—one of which, as the defendant
in *Cranley* was reminded, is to answer any inquiries truthfully—a reasonable
person in that defendant's position would view the probation officer's pres-
ence as increasing the pressure not only to answer questions, but also to
answer them truthfully during an interrogation. In the present case, Calixte's
absence during the defendant's interrogation by LaMaine and Curet decreased
the coercive aspects of the questioning.

State *v.* Brandon

In the present case, the defendant contends that the seizure of his cell phone demonstrates that the tenth *Mangual* factor, the degree to which he was isolated from friends, family and the public, weighs in favor of finding that he was in custody. We disagree. The defendant's reliance on this argument fails because he did not establish that the cell phone was seized prior to the final few minutes of the interrogation, when LaMaine announced the seizure. In fact, the record demonstrates that halfway through the interrogation, upon LaMaine's request, the defendant searched his phone for information on Outlaw. There is no evidence that the defendant was prevented from using the phone in his possession to send text messages to anyone or even to call anyone. The evidence in the record demonstrates that it was not until the end of the interrogation that LaMaine informed the defendant that, because he had provided Outlaw's phone number from his contacts on his cell phone, and because he had communicated with Outlaw on the phone, they were seizing the phone as part of the ongoing investigation. The defendant's suggestion that the deprivation of his phone supports his contention that a reasonable person would not have felt free to leave under those circumstances is belied by the fact that, within minutes after the seizure, he left.

Despite our conclusion that the seizure of the defendant's cell phone does not weigh in favor of finding that he was in custody, we recognize that many aspects of the tenth *Mangual* factor weigh in favor of a finding that the defendant was in custody. Specifically, the police officers chose the probation office as the location of the interrogation. Therefore, to the extent that the interrogation took place in a secure area, the police took actions that resulted in the defendant's being isolated during the interrogation. The weight of these facts is offset, however, by two other facts. First, the defendant was familiar with the probation office. Second, the

State *v.* Brandon

defendant failed to introduce evidence regarding the character of the building—whether the probation office occupied the entire building or shared space with other offices unrelated to law enforcement. See id., 619–20 (relying on defendant's failure to establish character of building where probation office was located in analysis and concluding that interview was noncustodial).

In summary, evaluating the totality of the circumstances, we conclude that the defendant has failed to establish both that a reasonable person in his position would not have felt free to leave and, most important, that there was a restraint on his freedom of movement of the degree associated with a formal arrest. The defendant was not ordered to meet with the police officers; nor was his probationary status threatened. The officers used no physical force or restraint. The defendant failed to establish that he was unable to leave the office without assistance, and he failed to prove that the officers denied him access to his phone prior to its seizure in the final moments of the interrogation. He was told repeatedly that he was not under arrest and was free to leave, yet the defendant continued to talk freely with LaMaine after being so advised. And the defendant did leave—without being placed under arrest.

Accordingly, we conclude that the trial court correctly determined that the defendant was not in custody during the first interview. Because the defendant's challenge to the trial court's denial of his motion to suppress the statements that he made during the second interview is predicated on his claim that he was in custody during the first interview, that challenge fails as well. Indeed, because the first interview was not custodial, the trial court correctly concluded that *Missouri* v. *Seibert*, supra, 542 U.S. 600, was inapplicable to the second interview. See id., 604 (opinion announcing judgment) (identifying issue presented as testing of "a police protocol for custodial interrogation that calls for

giving no warnings of the rights to silence and counsel until interrogation has produced a confession''); *United States* v. *Familetti*, 878 F.3d 53, 62 (2d Cir. 2017) (declining to reach defendant's claim based on *Seibert* because defendant ''was not subject to a [prewarning] custodial interrogation'').

The judgment is affirmed.

In this opinion ROBINSON, C. J., and KELLER and BRIGHT, Js., concurred.

D'AURIA, J., concurring in part and concurring in the judgment. I concur in the court's judgment affirming the trial court's judgment of conviction and in most of the majority's opinion and analysis. In particular, I conclude that, under federal constitutional law, the defendant, Bernard A. Brandon, has not met his burden of demonstrating that he was ''in custody'' during any part of the interrogation conducted by two police officers, Lieutenant Christopher LaMaine and Detective Ada Curet, at the office of the defendant's probation officer. See, e.g., *State* v. *Mangual*, 311 Conn. 182, 192 n.9, 85 A.3d 627 (2014) (''[t]he defendant bears the burden of establishing custodial interrogation'').

I write separately for two reasons. First, although we consistently have stated that the custodial determination is made considering '' 'the totality of the circumstances' ''; *State* v. *Edwards*, 299 Conn. 419, 428, 11 A.3d 116 (2011); in my view, that does not mean that a defendant cannot be in custody during one or more parts of the interrogation and not during others. In the present case, I believe there were two distinct parts of LaMaine and Curet's interrogation of the defendant— one that occurred before and the other that occurred after the defendant was advised that he was free to leave—and our review should examine the totality of each part of the interrogation. Second, I continue to

State *v.* Brandon

believe that trial courts, appellate courts and parties are not served well by talismanic recitations of multifactor tests that this and other courts have announced for the purpose of measuring constitutional questions. The present case is a good example.

As to the first reason why I write separately, I note that a defendant may not be in custody at the beginning of a police interrogation but may be determined to be in custody as the interrogation progresses. See, e.g., *Reinert* v. *Larkins*, 379 F.3d 76, 79 (3d Cir. 2004) (holding that defendant, while being transported in ambulance in presence of police officer, was not in custody when he made first statement but was in custody when he made second statement), cert. denied sub nom. *Reinert* v. *Wynder*, 546 U.S. 890, 126 S. Ct. 173, 163 L. Ed. 2d 201 (2005); see also *United States* v. *Martinez*, 602 Fed. Appx. 658, 659 (9th Cir. 2015) (holding that District Court improperly suppressed statements defendant made to police during first minute and forty-six seconds of interrogation because defendant was not in custody during that time). There is no reason that the opposite cannot be true: an interviewee may be met with circumstances that could constitute custody at the beginning of an interrogation, which might progress to a point where he might feel free to leave or he consents to further interrogation. Thus, at times, the issue of custody might call for a statement-by-statement examination, considering the circumstances at the time of each statement that the defendant seeks to suppress. See, e.g., *United States* v. *Thompson*, 976 F.3d 815, 824 (8th Cir. 2020) (determining custody based on relevant factors at time each statement was made during course of single traffic stop); *Locke* v. *Cattell*, 476 F.3d 46, 52 (1st Cir.) (dividing interrogation into two parts and deciding custody for each part separately), cert. denied, 552 U.S. 873, 128 S. Ct. 177, 169 L. Ed. 2d 121 (2007).

State *v.* Brandon

Upon my review of the record in the present case, I find there to be two distinct parts to the interrogation at issue, each requiring separate examination: the first twenty-one minutes before LaMaine advised the defendant that he was not under arrest and could leave, and the remainder of the interrogation. Neither the trial court nor the majority makes this distinction, which, in my opinion, is critical to the custody analysis in this case. Specifically, I agree with the majority, for the reasons it states, that the defendant was not in custody during the second portion of the interrogation. I cannot fully agree with the majority's analysis regarding the first part of the interrogation, however, because, in my view, several of the factors that it considers in "the totality of circumstances" have little or no relevance to the question of custody at that time.

It is undisputed that, from the time he arrived at the interrogation room, accompanied by Peter Bunosso, the supervisor of the defendant's probation officer, until the twenty-one minute mark of the interrogation, the defendant was given no *Miranda*[1] warnings and was never advised that he was free to leave or that he would not be arrested at the end of the interrogation. During those twenty-one minutes, in response to the officers' questioning, the defendant indicated that he had received a phone call from the victim on the night in question and acknowledged that the victim had asked to meet at a social club known as Robin's. The defendant denied that he went "down that way," however. The defendant then admitted that he had "most likely" driven a route that took him directly past Robin's at approximately 8:33 p.m. on the night of the murder. That admission placed the defendant momentarily in front of Robin's at the approximate time of the shooting. The defendant also acknowledged that, when he drove past Robin's,

_____

[1] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

he knew the victim was there. The defendant continued to maintain, however, that he "rolled down through there" and did not see the victim. Although the defendant ultimately made more inculpatory statements, both after being told he could leave the interrogation at any time and during his second interview at the police station, the statements just recounted were themselves inculpatory and were ultimately used against the defendant at trial.

I consider the question of whether the defendant was in custody during the first twenty-one minutes of the interrogation a much closer question than whether he was in custody during the balance of the interrogation. In fact, I would have my doubts that the defendant was not in custody during those first twenty-one minutes were it not for the abundant federal case law holding that probation status does not create the level of coercion required to transform a noncustodial interrogation into a custodial one unless the defendant's probation officer orders him to attend an interview with the police or threatens that his probation would be violated if he refused the meeting. See, e.g., *Minnesota* v. *Murphy*, 465 U.S. 420, 426, 435, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984). In light of this case law, I agree with the majority that the defendant was not in custody during the first twenty-one minutes of the interrogation. Specifically, I ultimately agree with the majority that the defendant did not sustain his burden of demonstrating that he was ordered, directed, or threatened to report to an interrogation. Without such evidence, and consistent with the great weight of federal case law, I cannot conclude that the defendant's status as a probationer establishes that he was in custody even before he was advised that he was free to leave at the twenty-one minute mark of the interrogation. In addition to the defendant's failure to offer any evidence that he was threatened or ordered to attend the interrogation, I

State *v.* Brandon

believe the following facts, as discussed by the majority,
along with facts the defendant did not prove, demon-
strate sufficiently for me that the defendant was not
restrained to the degree associated with a formal arrest
during the first twenty-one minutes of the interrogation.

First, the defendant failed to offer any evidence that
he objected to accompanying his probation officer, Sha-
vonne Calixte, to Bunosso's office to meet the police
officers.[2] Moreover, the tone and tenor of the interroga-
tion were cordial, the defendant was not handcuffed
or physically restrained, and the police officers did not
physically threaten him, use force, or brandish their
weapons.

Nevertheless, in reaching this conclusion, I note that
I do not agree that all of the factors that the majority

---

[2] Nevertheless, I note that I agree with the dissent in that I would not rely
on Calixte's testimony describing how she escorted the defendant to her
supervisor's office as in any way supporting a finding that the defendant
"chose," voluntarily, either to meet or remain with the officers. The issue
of whether Calixte informed the defendant that he had a choice to attend
the interrogation was hotly disputed at trial; Calixte's testimony was at best
ambiguous on this issue, and the trial court made no findings on this issue.
The trial court, which heard her testimony, was best suited to assess her
credibility and whether her testimony was purposefully evasive. It is not
for this court to assess witness credibility or to find facts.

Both the majority and the dissent recount Calixte's testimony at length,
and so I will not repeat it here. To the extent the majority suggests that we
may review the record as a whole, including Calixte's testimony, and con-
clude that the defendant voluntarily chose to attend or remain in the meeting,
I disagree. The trial court did not make any findings about whether the
defendant had a "choice" to meet with the officers; nor did it specifically
credit Calixte's testimony. The majority apparently considers itself free
to "review the record in its entirety to determine whether a defendant's
constitutional rights were infringed by the denial of a motion to suppress.
*State* v. *Kendrick*, 314 Conn. 212, 218 n.6, 100 A.3d 821 (2014); see, e.g.,
*State* v. *Fields*, 265 Conn. 184, 191, 827 A.2d 690 (2003) (record on review
of ruling on pretrial motion to suppress includes evidence adduced at trial);
see also, e.g., *State* v. *Toste*, 198 Conn. 573, 576, 504 A.2d 1036 (1986)."
(Internal quotation marks omitted.) Footnote 4 of the majority opinion. But
this is true only for undisputed facts established in the record. See *State* v.
*Edmonds*, 323 Conn. 34, 39, 145 A.3d 861 (2016); see also *State* v. *Castillo*,
329 Conn. 311, 340, 186 A.3d 672 (2018) (*D'Auria, J.*, dissenting).

State *v.* Brandon

addresses are relevant to determine the issue of custody during the first twenty-one minutes of the interrogation. This, in turn, leads to the second reason why I write separately—to once again caution that I see danger in our overreliance on multifactor tests for undertaking such a " 'slippery' " task as measuring whether an individual is in custody. *State* v. *Mangual*, supra, 311 Conn. 193;[3] see also *State* v. *Januszewski*, 182 Conn. 142, 158,

[3] One device that courts and counsel should employ to guard against overreliance on multifactor tests is to look back to the derivation of the test to see if it is truly applicable. Undertaking that examination in the present case reveals that the usefulness of the *Mangual* factors as a whole in these circumstances is debatable. In *Mangual*, this court explained that the ten factors it listed were the result of "[a] review of . . . cases from this state, as well as federal and sister state cases involving the interrogation of a suspect *during a police search of his residence* . . . ." (Emphasis added.) *State* v. *Mangual*, supra, 311 Conn. 196–97. Thus, these factors were developed from case law addressing whether a defendant was in custody when interrogated during a police search of his or her residence. Whether reasonable persons in that circumstance would feel free to leave their homes, or to tell the police to leave, is at least a somewhat different inquiry than an inquiry into whether custodial interrogation existed at a police station or a probation office. Less than one decade later, however, it is not clear to me that we have given any thought to whether each *Mangual* factor has any relevance to other alleged custodial circumstances or whether we have instead transformed those factors into a test that must be applied to all determinations of custody, regardless of the circumstances. See, e.g., *State* v. *Arias*, 322 Conn. 170, 177–79, 140 A.3d 200 (2016) (applying *Mangual* factors to determine if defendant was in custody when interrogated at police station); *State* v. *Garrison*, 213 Conn. App. 786, 810–11, 814–27, 278 A.3d 1085 (applying *Mangual* factors to determine custody when defendant was interrogated at hospital), cert. granted, 345 Conn. 959, A.3d (2022); *State* v. *Chankar*, 173 Conn. App. 227, 237–38, 162 A.3d 756 (applying *Mangual* factors to determine custody when defendant was interrogated at cemetery), cert. denied, 326 Conn. 914, 173 A.3d 390 (2017); *State* v. *Cervantes*, 172 Conn. App. 74, 87–88, 158 A.3d 430 (applying *Mangual* factors to determine custody when defendant was interrogated inside police vehicle), cert. denied, 325 Conn. 927, 169 A.3d 231 (2017). However, some of the *Mangual* factors that are clearly relevant to evaluating custody when a defendant is interrogated inside his or her home—such as the number of officers present for the interrogation—appear to me often to be irrelevant when a defendant is interrogated at a police station, where, regardless of the number of officers present for the interrogation, the defendant could not leave without passing by numerous officers.

This further supports my caution against the use of multifactor tests. Many of this court's multifactor tests are simply a result of this court's

State *v.* Brandon

438 A.2d 679 (1980) ("[w]hat constitutes police custody
for purposes of the *Miranda* warnings is not always
self-evident") (overruled in part on other grounds by
*State* v. *Hart*, 221 Conn. 595, 605 A.2d 1366 (1992)),
cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d
1005 (1981). Although a list of factors can be useful as an
issue spotting exercise, and reviewing courts (including
this one) always note that the list is "nonexclusive," in
practice, courts and litigants are inclined to use the
factors as a checklist or as a point of comparison between
the present case and cases in which a court has held
that the defendant was or was not in custody based
on particular facts. A too "heavy focus on enumerated

having broadly surveyed—indeed, truly listing—the factors that have been
determinative in prior cases. *State* v. *Geisler*, 222 Conn. 672, 610 A.2d 1225
(1992), is perhaps the classic example in our jurisprudence. In *Geisler*, in
establishing a multifactor test for claims brought under the state constitution,
we noted that, in some prior cases, one of the dispositive factors was relevant
federal precedent, but in other prior cases, one of the dispositive factors
was public policy concerns. See id., 684–85. Forever since, both federal
precedent and public policy concerns have become part of the multifactor
test, which, now, in my opinion, seems to focus more on the number of
factors satisfied than on which factors are actually relevant to the circum-
stances at issue. See *Connecticut Coalition for Justice in Education Fund-
ing*, *Inc.* v. *Rell*, 295 Conn. 240, 401 n.2, 990 A.2d 206 (2010) (*Zarella*, *J.*,
dissenting) ("question[ing] [*Geisler*'s] legitimacy on the ground that it is no
more than a checklist from which to select [various interpretive] tools and
that it provides no guidance as to the significance of selecting any particular
method in any particular case" (internal quotation marks omitted)). Other
examples abound. See, e.g., *State* v. *Victor O.*, 301 Conn. 163, 174, 20 A.3d
669 ("[r]ecognizing the indefiniteness inherent in applying [the] multifactor
approach [under the test set forth in *State* v. *Porter*, 241 Conn. 57, 698 A.2d
739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645
(1998)], we observed that [t]he actual operation of each factor, as is the
determination of which factors should be considered at all, depends greatly
on the specific context of each case" (internal quotation marks omitted)),
cert. denied, 565 U.S. 1039, 132 S. Ct. 583, 181 L. Ed. 2d 429 (2011); *State*
v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987) (setting forth multifactor
test for determining prejudice caused by prosecutorial impropriety after
reviewing various factors that have been dispositive in prior cases); see also
*Neil* v. *Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 34 L. Ed. 2d 401
(1972) (employing multifactor test for determining reliability of identification
despite use of suggestive procedures during confrontation procedure based
on factors that have been relevant in prior cases).

State *v.* Brandon

factors, or comparisons to other precedents, may eclipse the ultimate inquiry before the court, which is case specific: whether a reasonable person in the defendant's position would believe that there was a restraint on [his] freedom of movement of the degree associated with a formal arrest.'' (Internal quotation marks omitted.) *State* v. *Castillo*, 329 Conn. 311, 341, 186 A.3d 672 (2018) (*D'Auria, J.*, dissenting).

In my view, the trial court's and the majority's reliance on certain of the *Mangual* factors illustrates not only the limits of a multifactor test but also the need to conduct our custody analysis on a statement-by-statement basis. Rather than look at the factors truly relevant to the circumstances at issue, both the trial court and the majority rely heavily on a survey of all of these factors. Although many of the factors that the majority relies on in holding that, as a whole, the defendant was not in custody during the entirety of the police interrogation also weigh in favor of holding that he failed to meet his burden of showing that he was in custody during both the first twenty-one minutes of the interrogation and the remainder of the interrogation, not all factors apply to both analyses. For example, I find the majority's reliance on certain factors—such as the number of times the defendant was told he was free to leave (seven), the fact that the interview lasted only ninety minutes and that he was ultimately not arrested after that interview—to be irrelevant to the question of whether he was in custody during the first twenty-one minutes of the interrogation. I address each of these factors in turn.

I agree with the majority that the fact that the defendant was advised—and advised repeatedly—that he was free to leave the interrogation room weighs heavily against the defendant's being in custody for the second portion of the interrogation. The defendant continued to answer questions despite being told he was free to

State *v.* Brandon

leave and not under arrest. But he was never told this during the first twenty-one minutes of the interrogation. If conditions or circumstances were such that we might conclude that a defendant was in custody early in the interrogation, a belated advisement that he could leave of his own free will would not, in my view, cure the earlier custodial circumstance. See *People* v. *Barritt*, 325 Mich. App. 556, 570, 574–75, 926 N.W.2d 811 (2018) (holding that defendant was in custody when majority of questioning occurred before police told defendant he was not under arrest), appeal denied, 928 N.W.2d 224 (Mich. 2019). Thus, in my view, the officers' belated statements that the defendant was not under arrest and free to leave the interrogation have no weight in our custody determination regarding the first twenty-one minutes of the interrogation.

Nor does the fact that the interrogation lasted "only" ninety minutes warrant much, if any, emphasis in analyzing whether the defendant was in custody during the first twenty-one minutes. Although the duration of the interrogation might, in some cases, assist a court in determining the custody question, including whether the interview was fleeting or lasted what anyone might objectively consider to be a "long" time, this factor seems to serve only as a comparator among reported decisions. I submit that it is used as such because it lends itself to an objective number, which is easy to compare to the case at hand. "That courts and litigants will seek to highlight or explain away certain factors, or compare and contrast the relevant factors in one case to those considered in another case, is a predictable result of court developed multifactor tests, including the *Mangual* factors for measuring custody." *State* v. *Castillo*, supra, 329 Conn. 341 (*D'Auria*, *J.*, dissenting).

For example, the majority concludes that this factor does not weigh in favor of custody because this court previously has held that a defendant was not in custody

State *v.* Brandon

despite a two and one-half hour interrogation. See *State*
v. *Pinder*, 250 Conn. 385, 414, 736 A.2d 857 (1999).
Because, however, a suspect in most instances does
not know when the interrogation will end and does
not know the length of other interrogations that were
determined to be custodial or noncustodial in reported
cases, we cannot credit the objectively reasonable per-
son in the defendant's circumstances with such knowl-
edge, and, thus, this fact is of very limited use in
measuring whether the defendant was restrained to
the degree associated with a formal arrest. See *United
States* v. *Griffin*, 922 F.2d 1343, 1348 (8th Cir. 1990)
("[t]he length of the interrogation has been a[n] . . .
undeterminative factor in the analysis of custody").
Moreover, to the extent that this factor shows that the
interrogation at issue did not last an objectively long
time as a whole, this evidence is irrelevant to whether
the defendant was in custody during the first twenty-
one minutes of the interrogation when he had no knowl-
edge of how much longer the interrogation would last.
Thus, this factor plays no role in my determination of
whether the defendant has met his burden of showing
that he was in custody during the first twenty-one
minutes of the interrogation. Nevertheless, the absence
of this factor does not undermine my agreement with
the majority that the defendant has failed to satisfy
this burden.

Similarly, regardless of the fact that the defendant
was not told that he was free to leave or was not under
arrest during the first twenty-one minutes of the interro-
gation, the fact that he was not arrested at the end of
the interrogation adds nothing to support a determina-
tion that he was not in custody during the first twenty-
one minutes of the interrogation. Even if he is not
arrested at the end of an interrogation, a defendant has
no idea during the interrogation if he will be arrested.
The only definitive way he will know if he is under

State *v.* Brandon

arrest is either at the end of the interrogation, when the police officers decide whether to arrest him, or if he tries to leave before the interrogation is over. Even if that were minimally relevant to whether the circumstances of the interrogation as a whole were akin to an arrest,[4] I fail to see how this factor shines any light on the question of whether the circumstances of the interrogation were akin to a formal arrest during the first twenty-one minutes of the interrogation.

Nevertheless, I agree with the majority that the defendant has not sustained his burden of proving that he was in custody either during the first twenty-one minutes or during the second portion of the interrogation.

Accordingly, I respectfully concur in part.

ECKER, J., with whom McDONALD, J., joins, dissenting. The majority concludes that the defendant, Bernard A. Brandon, was not in custody during his first police interrogation for purposes of *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), even though the interrogation immediately followed a mandatory meeting with the defendant's probation officer, the interrogation was conducted by two armed police officers in a closed room inside a locked area of the probation building in which the defendant was not permitted to move about unescorted, and the police threatened to arrest the defendant if he refused

---

[4] The majority likewise questions the relevance of this factor: "We acknowledge the tension with placing significant weight on this factor given that a suspect may not know at the outset of or during a particular interrogation whether he will be permitted to leave at the end of the interrogation. However, both the United States Supreme Court and this court have considered this factor in the totality of the circumstances that bear on a custody determination. Thus, although we do not place great weight on this factor, we nevertheless consider it in accordance with long-standing, established precedent in this area." Footnote 18 of the majority opinion; see *Howes* v. *Fields*, 565 U.S. 499, 509, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012).

State *v.* Brandon

to cooperate with their investigation. I cannot agree. In my view, the defendant's first interrogation took "place in a police-dominated atmosphere containing [inherent] pressures [that, by their very nature, tend] to undermine the individual's [ability to make a free and voluntary decision as to whether to speak or remain silent]"; (internal quotation marks omitted) *State* v. *Mangual*, 311 Conn. 182, 196, 85 A.3d 627 (2014); which is precisely the type of coercive environment that makes *Miranda* warnings necessary.

The fundamental flaw in the majority opinion is its failure to conduct the required analysis with due consideration for the single most important lesson of *Miranda* and its progeny, which is that modern interrogation techniques can purposefully and deliberately be employed —as they were in the present case—to create intense psychological pressure intended to overbear a suspect's will and to induce him to make self-incriminating statements. See, e.g., *Berkemer* v. *McCarty*, 468 U.S. 420, 433, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984) ("[t]he purposes of the safeguards prescribed by *Miranda* are to ensure that the police do not coerce or trick captive suspects into confessing . . . [and] to relieve the inherently compelling pressures generated by the custodial setting itself, which work to undermine the individual's will to resist" (emphasis omitted; footnote omitted; internal quotation marks omitted)). The majority focuses far too narrowly on the supposed absence of physical restraints imposed on the defendant and correspondingly understates the very real psychological effect that the interrogating officers' pressure tactics had on the defendant. In the process, the majority loses sight of "the coercive pressure that *Miranda* was designed to guard against . . . ." *Maryland* v. *Shatzer*, 559 U.S. 98, 112, 130 S. Ct. 1213, 175 L. Ed. 2d 1045 (2010); see also *J. D. B.* v. *North Carolina*, 564 U.S. 261, 279, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011) (recognizing

State *v.* Brandon

importance of "internal" or "psychological" impacts on suspect's perception in determining whether suspect is in custody for purposes of *Miranda* (internal quotation marks omitted)); *Arizona* v. *Fulminante*, 499 U.S. 279, 287, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991) ("coercion can be mental as well as physical" (internal quotation marks omitted)).

In short, the majority's custody analysis loses sight of the primary and essential purpose that *Miranda* was designed to serve and the evils it was intended to prevent. That purpose is to protect prophylactically against the coercive pressures that often arise in the specific context of police interrogations. Custody is "the touchstone for application of [the *Miranda*] warning requirement"; *United States* v. *Newton*, 369 F.3d 659, 671 (2d Cir.), cert. denied, 543 U.S. 947, 125 S. Ct. 371, 160 L. Ed. 2d 262 (2004); not because it has independent constitutional significance in this context, but because the United States Supreme Court has identified it as "a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes* v. *Fields*, 565 U.S. 499, 508–509, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012). Thus, *Miranda* warnings are not required only when a suspect has been placed under formal arrest, but also when the circumstances under which the interrogation occurs give rise to the "coercive pressure [that] is *Miranda*'s underlying concern . . . ." *United States* v. *Newton*, supra, 671; see *United States* v. *Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990) ("[the] indicia of custody [factors] relate to the specific police practices employed during questioning [that] tend to either mitigate or aggravate an atmosphere of custodial interrogation"). Because I do not believe that the majority opinion fulfills the promise of *Miranda* and its progeny, I respectfully dissent.

The following facts are relevant to the analysis. The defendant was on probation at the time of his interroga-

State *v.* Brandon

tion and, as a condition of his probation, was required
"to cooperate with his probation officer[s]" and to "fol-
low their directions . . . ." On February 16, 2016, the
defendant attended a mandatory meeting with his pro-
bation officer, Shavonne Calixte, at the Office of Adult
Probation located in Bridgeport (probation building).
The probation building is a secure facility, guarded by
uniformed judicial marshals. Visitors must pass through
a metal detector and security checkpoint on the first
floor to access the second and third floors, which are
occupied by the probation department. The offices on
the second and third floors are within locked areas,
and probationers may enter only with the assistance of
an escort.

The defendant met with Calixte in a reporting room
on the third floor of the probation building. At the con-
clusion of their meeting, Calixte informed the defendant
that, "if he had a moment, he can speak to someone
else who would like to talk to him." Calixte did not tell
the defendant who wanted to talk to him or that he
had a choice to decline to attend the meeting.[1] Calixte

[1] The trial court did not find that Calixte informed the defendant that he
had a choice to decline to attend the meeting in her supervisor's office, and
the record reasonably cannot be construed to support such a finding. At
the suppression hearing, Calixte testified that she "basically let [the defen-
dant] know the office visit was concluded. We were done, and we were
walking downstairs, but, if he had a moment, he can speak to someone else
who would like to talk to him." The following exchange then occurred
between Calixte and defense counsel:

"[Defense Counsel]: Do you recall whether or not you gave [the defendant]
any choice to . . . .

"[Calixte]: There's always a choice. Of course, I gave him a choice.

"[Defense Counsel]: You told him . . . I'm going to take you downstairs
now, okay. My supervisor wants to see you, but you don't have to see my
supervisor. Is that your recollection?

"[Calixte]: I don't recall. I don't recall."

By far the most reasonable construction of Calixte's testimony, viewed
in its entirety, is that she could not recall whether she informed the defendant
that the downstairs meeting was not mandatory. Immediately following her
mid-question declamation, in which she cut off counsel to explain that there
is "always" a choice, Calixte was asked directly if she told the defendant

escorted the defendant to the second floor, where she was met by her supervisor, Chief Probation Officer Peter Bunosso.

Bunosso escorted the defendant to Bunosso's office, which was located within a locked and secured area. Two armed police officers, Lieutenant Christopher LaMaine and Detective Ada Curet, were waiting for the defendant inside. Bunosso did not advise the defendant that he did not have to attend the meeting or that he was not required to answer the police officers' questions. Indeed, Bunosso did not converse with the defendant at all. Instead, Bunosso removed some work files and closed the door behind him, leaving the defendant alone in a closed room with two armed police officers in a locked area of the probation building.

LaMaine and Curet were wearing plain clothes, with their badges and guns visibly displayed. The officers did not brandish their weapons or physically restrain the defendant, but they also did not tell him that he was free to leave at the beginning of the interrogation or advise him of his *Miranda* rights.

During the first twenty-one minutes of questioning, LaMaine informed the defendant that, on the basis of witness statements and the victim's cell phone records, the police knew that the defendant had engaged in a heated argument with the victim on the night of the murder and that the victim had called the defendant and arranged to meet him at an establishment called Robin's. LaMaine also told the defendant that security

that "[m]y supervisor wants to see you, *but you don't have to see my supervisor*." (Emphasis added.) Her answer: "I don't recall." Indeed, she emphasized that she did not recall what she told the defendant by repeating the concession twice. As discussed in more detail later in this opinion, in the absence of an advisement that the meeting was optional and that there would be no adverse consequences for declining to attend, a reasonable person in the defendant's position would not have believed that he had a voluntary choice to refuse to comply with Calixte's suggestion.

State *v.* Brandon

camera footage in the area depicted the defendant's vehicle driving to Robin's and stopping there for one and one-half to two minutes at the time that the victim was killed. Faced with this alleged evidence, the defendant confessed that he had had an argument with the victim, that the victim had called and asked to meet him at Robin's, and that the defendant had driven by Robin's at the approximate time of the shooting, but the defendant denied that he had stopped and talked to the victim. Thus, prior to being advised that he was not obligated to answer the police officers' questions or that he was free to leave, the defendant provided the police with strong evidence, out of his own mouth, that implicated himself in the victim's murder.

After the defendant's inculpatory admissions, LaMaine told the defendant for the first time that he could "walk away right now if [he] want[s]" and that "nothing [he] say[s] is going to get [him] arrested today . . . ." LaMaine also informed the defendant, however, that he was the prime, indeed the only, suspect in the victim's murder because he had been alone outside with the victim on the bitterly cold night that the victim was killed. According to LaMaine, the police had acquired security footage that portrayed the defendant driving away as the victim staggered out of a vehicle suffering from a gunshot wound.[2] LaMaine advised the defendant

---

[2] No such evidence was adduced at trial, and it appears that LaMaine lied to the defendant regarding the existence of the evidence to induce a confession. I recognize that, in *Oregon* v. *Mathiason*, 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977), the United States Supreme Court held that such factual misrepresentations have "nothing to do with whether [a defendant] was in custody for purposes of the *Miranda* rule." Id., 496. But see id., 497 (Marshall, J., dissenting) (recognizing that defendant would not feel free to leave during questioning "after being told by the police that they thought he was involved in a burglary and that his fingerprints had been found at the scene"). I am, of course, "bound to accept the law as formulated by the Supreme Court of the United States" to resolve the defendant's federal constitutional claim; (internal quotation marks omitted) *State* v. *Dickson*, 322 Conn. 410, 472 n.11, 141 A.3d 810 (2016) (*Zarella, J.*, concurring in the judgment), cert. denied,      U.S.      , 137 S. Ct. 2263, 198 L. Ed. 2d 713

State *v.* Brandon

that now was the time for him to tell his version of
events because it would not be deemed credible if he
waited until later. LaMaine told the defendant that he
"can walk out right now" but cautioned that, "if you
do, we gotta go on the facts we have. There's just the
two of you there. We know that as a fact because this
isn't June. This was a zero degree night. There's two
of you, and, like I said, there's witnesses there. So, we
can basically say that, you know, somehow he gets shot
when it's just the two of you. Yeah, we're probably
gonna be writing a murder warrant for you. And down
the road, you might want to say, 'okay, well, I want to
tell my side of the story, like he pulled a gun or some-
thing.' And not that you can't. You're gonna. But it's
gonna not sound very credible because everybody when
they're jammed up says, 'oh well, let me tell you, it
was self-defense, or he pulled a gun.' Right, you know.
Everybody does. So, we're saying, if that's what hap-
pened, tell us now because it's kind of credible now.
We'll say [the defendant] was cooperative, he met with
us voluntarily, he told us this, and we'll check it out.
But, you know, later on you're gonna, you're gonna
come up with that story later on. I know that. But it
just won't be credible because, yeah, everybody comes
up with it once they're arrested. So, we're not here to,
you know, put any pressure on you. You're, like I said,

(2017); and, therefore, I am required to agree with the majority that LaMaine's
factual misrepresentations during the first interrogation have no bearing on
the *Miranda* custody analysis. But see footnote 6 of this opinion. My own
view is that we know a great deal more about false confessions today than
we did forty-five years ago, and Justice Marshall's dissent in *Mathiason* has
been proved prescient. As I explained in my concurring and dissenting
opinion in *State* v. *Griffin*, 339 Conn. 631, 262 A.3d 44 (2021), cert. denied,
　　　U.S.　　　, 142 S. Ct. 873, 211 L. Ed. 2d 575 (2022), "lying to suspects
about evidence against them contributes to false confessions" by making
suspects "feel trapped by the inevitability of evidence against them." (Inter-
nal quotation marks omitted.) Id., 730–31 (*Ecker, J.*, concurring in part and
dissenting in part). Because such deceptive interrogation tactics contribute
to the coercive nature of an interrogation, they should factor into the cus-
tody analysis.

State *v.* Brandon

free to go, you can walk out now. I think these guys,
they don't have any questions for you. But, God, how
does that look if you're us?''

LaMaine explicitly threatened to arrest the defendant
soon thereafter. A few minutes after suggesting that it
was now or never to give his version of events, LaMaine
told the defendant that, ''honestly, if we leave it like
this, we're gonna write a murder warrant for you, and,
if it was your buddy, because someone was with you,
tell us. But you're by yourself. It's two of you. I got two
guys that are hot, that . . . had a couple drinks, that
agreed they're gonna meet, that are the only people
there. And one of them was shot. How do you explain it?
Try.'' When the defendant did not offer an explanation,
LaMaine repeated the point again, saying that, ''[i]f we
leave here with this story, we're gonna write a murder
warrant for you. Period.'' Curet added, ''[w]e have no
choice.''

At this point in the interview, the defendant changed
his story, explaining that he was not alone in the car,
as he previously had stated, but was accompanied by
a passenger named Outlaw, who shot and killed the
victim. According to the defendant, Outlaw was in the
passenger seat when he stopped at Robin's. Outlaw
exited the car and spoke to the victim, shots were fired,
and then Outlaw jumped back into the car. The defen-
dant drove away and dropped Outlaw off on Connecti-
cut Avenue in Bridgeport shortly after the shooting.

LaMaine and Curet pressed the defendant for details
regarding Outlaw's identity, explaining that they had to
prove a case against Outlaw and that, if they could not
do that, then the defendant was ''the one going'' and
was not going to ''walk . . . .'' The defendant began
searching his cell phone for Outlaw's contact informa-
tion. The defendant provided LaMaine and Curet with
Outlaw's phone number and physical description and

State *v.* Brandon

informed them that Outlaw previously had been convicted in connection with a shooting. LaMaine and Curet continually questioned the credibility of the defendant's account of events for the next forty minutes, but the defendant maintained that Outlaw had been present at the scene and had shot the victim. At the conclusion of the interrogation, which lasted approximately ninety minutes from start to finish, LaMaine and Curet seized the defendant's cell phone and arranged to meet him at the police station later that evening to identify Outlaw from photographs.

The defendant subsequently was arrested and charged with the victim's murder, in violation of General Statutes § 53a-54a, among other crimes. Prior to trial, the defendant moved to suppress, among other things, the statements he made during the first interrogation, arguing in pertinent part that his statements were procured in violation of *Miranda*. The trial court denied the defendant's motion, finding that, although the defendant was subject to interrogation for purposes of *Miranda*, the defendant was not in custody because he was never handcuffed or physically restrained, the police officers did not brandish their weapons, the tone of the interrogation was cordial, and the defendant was informed multiple times that he was free to leave. The defendant's statements were admitted into evidence at his jury trial, and the defendant was convicted of the lesser included offense of manslaughter in the first degree with a firearm, in violation of General Statutes § 53a-55a (a).

The sole issue on appeal is whether the defendant was in custody during the first interrogation and, as such, entitled to *Miranda* warnings. As we previously have explained, the term "custody" in the context of *Miranda* and its progeny "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." (Internal quotation marks

State *v.* Brandon

omitted.) *State* v. *Mangual*, supra, 311 Conn. 193, quoting *Howes* v. *Fields*, supra, 565 U.S. 508–509. The custody inquiry is important "because the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements" and "heightens the risk that statements obtained therefrom are not the product of the suspect's free choice." (Internal quotation marks omitted.) Id., 191. The court in *Miranda* was concerned with protecting criminal defendants from "the incommunicado nature of [police] interrogations" and the concomitant "psychological pressure"; *United States* v. *LeBrun*, 363 F.3d 715, 722 (8th Cir. 2004), cert. denied, 543 U.S. 1145, 125 S. Ct. 1292, 161 L. Ed. 2d 105 (2005); which "work to undermine the individual's will to resist and to compel him to speak [when] he would not otherwise do so freely . . . . By adequately and effectively appris[ing] [a suspect] of his rights and reassuring the suspect that the exercise of those rights must be fully honored, the *Miranda* warnings combat [the] pressures inherent in custodial interrogations . . . [and] enhance the trustworthiness of any statements that may be elicited during an interrogation." (Citations omitted; internal quotation marks omitted.) *State* v. *Mangual*, supra, 191; see *J. D. B.* v. *North Carolina*, supra, 564 U.S. 269 ("the physical and psychological isolation of custodial interrogation can undermine the individual's will to resist and . . . compel him to speak [when] he would not otherwise do so freely" (internal quotation marks omitted)).

Courts have struggled to define the "slippery" concept of custody. *Oregon* v. *Elstad*, 470 U.S. 298, 309, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985). The federal cases since *Miranda* have articulated an objective, two part analysis, known as the "reasonable person test . . . ." (Internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 193. First, the court must

State *v.* Brandon

ascertain whether, "in light of the objective circumstances of the interrogation . . . a reasonable person [would] have felt [that] he or she was not at liberty to terminate the interrogation and [to] leave." (Citation omitted; internal quotation marks omitted.) Id., quoting *Howes* v. *Fields*, supra, 565 U.S. 509. Determining "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest"; (internal quotation marks omitted) *Maryland* v. *Shatzer*, supra, 559 U.S. 112; "is simply the first step in the analysis, not the last." *Howes* v. *Fields*, supra, 509. This is because the restraint on the suspect's freedom of movement does not, standing alone, demonstrate that the suspect is subject to the type of coercive "concerns that powered [*Miranda*] . . . ." Id., 514.[3] Thus, if the freedom of movement prong is satisfied, a court must examine the second prong of the reasonable person test, which asks "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *State* v. *Mangual*, supra, 193, quoting *Howes* v. *Fields*, supra, 509. "Only if the answer to this second question is yes was the person in custody for practical purposes . . . and entitled to the full panoply of protections prescribed by *Miranda*." (Internal quotation marks omitted.) *State* v. *Mangual*, supra, 194–95 n.12.

The majority states that I have "inappropriately collapse[d] the free to leave inquiry with the restraint to the degree associated with a formal arrest inquiry."

[3] For example, a suspect may not be free to walk away from an interrogation conducted in his or her own home, or while incarcerated, or during the course of a traffic stop or other lawful detention. See *United States* v. *Faux*, 828 F.3d 130, 135–36 (2d Cir. 2016) (recognizing that suspect might not feel free to leave or terminate interrogation conducted in his or her own home, but nonetheless not all in-home interrogations are custodial for purposes of *Miranda*); see also *Maryland* v. *Schatzer*, supra, 559 U.S. 113–14 (same for interrogation of prison inmate); *Berkemer* v. *McCarty*, supra, 468 U.S. 437 (same for interrogation during traffic stop).

State *v.* Brandon

Footnote 12 of the majority opinion. To the contrary, I am fully aware that the free to leave inquiry is only the first step in a two part analysis. The second part of the analysis, as I state in the preceding paragraph and reference throughout this opinion, asks "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes* v. *Fields*, supra, 565 U.S. 509.[4] Indeed, the second part of the custody inquiry is critical to my analysis because it identifies precisely the issues that I believe are overlooked by the majority. As *Howes* and other cases explain, the second question is necessary because *Miranda* is concerned with a *particular kind of coercion*—the coercive pressures created by "interrogations that take place in a police-dominated atmosphere containing [inherent] pressures [that, by their very nature, tend] to undermine the individual's [ability to make a free and voluntary decision as to whether to speak or remain silent]

_____

[4] Ironically, it is the majority that collapses the custody inquiry and that fails to attend to the second part of the two part analysis prescribed by *Howes*. In lieu of asking whether the circumstances surrounding the interrogation present the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*, the majority skips that inquiry and substitutes a different one. The substitute, which is repeated with talismanic reverence dozens of times by the majority, disregards the coercive pressures prong and focuses solely on whether the defendant was subjected to restraint to a degree associated with a formal arrest. The majority's analytical shortcut results in a tautology by asking the ultimate question first. A reviewing court cannot determine whether the restraint on a suspect's freedom of movement rose to the level of a formal arrest without first asking whether the pressures brought to bear on a suspect were the same type of coercive pressures against which *Miranda* was designed to protect. Stated simply, the "restraint to a degree associated with a formal arrest" inquiry is the end product of the two part analysis, not the predicate question. To determine whether a suspect was restrained to the degree associated with a formal arrest, a reviewing court must ask whether the totality of the circumstances (physical *and* psychological) would combine (1) to lead a reasonable person in those circumstances to believe that he was not free to leave or terminate the interrogation, and (2) to give rise to the same type of inherently coercive pressures as the station house questioning at issue in *Miranda*.

State *v.* Brandon

. . . .'' (Internal quotation marks omitted.) *State* v.
*Mangual*, supra, 311 Conn. 196. The second inquiry is
necessary because the circumstances triggering *Miranda*
will not necessarily be present merely because the inter-
rogation is conducted in a location that coincidentally
happens to restrict the suspect's freedom of movement.
See footnote 3 of this opinion. *Miranda*, in sum, is
implicated when the police have not formally arrested
a suspect but nonetheless employ interrogation prac-
tices, whether physical or psychological, that deliber-
ately generate the same kind of coercive pressures as
would an actual arrest.

The in-custody inquiry is flexible and fact intensive.
Indeed, we have emphasized that there is ''no definitive
list of factors'' because the custody analysis must, by
necessity, ''be based on the circumstances of each case
. . . .'' (Internal quotation marks omitted.) *State* v.
*Mangual*, supra, 311 Conn. 196. That having been said,
the analysis is conducted with attention ''to those kinds
of concerns'' at the heart of *Miranda*, namely, *Miran-
da*'s ''expressed concern with protecting defendants
against interrogations that take place in a police-domi-
nated atmosphere containing [inherent] pressures [that,
by their very nature, tend] to undermine the individual's
[ability to make a free and voluntary decision as to whether
to speak or remain silent] . . . .'' (Internal quotation
marks omitted.) Id. We have identified the following
nonexclusive list of factors (*Mangual* factors) to guide
the custody analysis: ''(1) the nature, extent and dura-
tion of the questioning; (2) whether the suspect was
handcuffed or otherwise physically restrained; (3) whether
officers explained that the suspect was free to leave or
not under arrest; (4) who initiated the encounter; (5)
the location of the interview; (6) the length of the deten-
tion; (7) the number of officers in the immediate vicinity
of the questioning; (8) whether the officers were armed;
(9) whether the officers displayed their weapons or

State *v.* Brandon

used force of any other kind before or during questioning; and (10) the degree to which the suspect was isolated from friends, family and the public.” Id., 197.

It is vital to keep in mind that *Mangual* never intended to formulate a rote checklist for mechanical application in every case. The foregoing factors are not exhaustive, and “a heavy focus on enumerated factors, or comparisons to other precedents, may eclipse the ‘ultimate [custody] inquiry’ before the court, which is case specific . . . .” *State* v. *Castillo*, 329 Conn. 311, 341, 186 A.3d 672 (2018) (*D’Auria, J.*, dissenting); see also *J. D. B.* v. *North Carolina*, supra, 564 U.S. 270–71 (“[r]ather than demarcate a limited set of relevant circumstances, we have required police officers and courts to examine all of the circumstances surrounding the interrogation . . . including any circumstances that would have affected how a reasonable person in the suspect’s position would perceive his or her freedom to leave” (citation omitted; internal quotation marks omitted)).

In my view, the majority’s mechanical application of the *Mangual* factors obscures the proper analysis with respect to the defendant’s custodial status.[5] For this

_____

[5] The majority denies applying the *Mangual* factors in a “mechanical” fashion; footnote 14 of the majority opinion; but I find that the majority’s rote recitation of each *Mangual* factor, followed by a conclusion as to whether that individual factor is “the functional equivalent of a formal arrest,” obscures and frustrates the goal of determining whether these factors—in their totality—combine “to present a serious danger of coercion” for purposes of *Miranda*. (Internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 193. Although some of the *Mangual* factors standing alone may be insufficient to establish that a suspect was in custody, it is important to remember that the factors are not exclusive, none of the factors stands in isolation, and the essential issue remains a wholistic assessment of the nature and degree of coercive pressure that a reasonable person would have felt under the circumstances.

Numerous courts and commentators have cautioned against the dangers that attend the mechanical application of multifactor tests. “Although multifactor tests are ubiquitous, they are imperfect. . . . When judges excessively rely on multifactor tests . . . there is a risk of mechanical jurisprudence,” which “may unduly restrict judges from tailoring their analysis to the case.” C. Guthrie et al., “Blinking on the Bench: How Judges

State *v.* Brandon

reason, I see no need to respond point by point to the majority's conclusion regarding each factor, and doing so would serve only to replicate what I consider to be a flawed methodology. With respect to the factors that are relevant to this case, I believe the majority improperly assesses their weight and importance in deciding the ultimate issue, namely, whether a reasonable person in the defendant's position would have believed that his freedom of movement had been restrained to the degree associated with a formal arrest.

First, although the tone of the interrogation was cordial, the iron fist beneath the velvet glove was palpable. The interrogating officers made it clear that the defendant was the prime, if not the only, suspect in the victim's murder; indeed, they told him that his arrest was both inevitable and forthcoming unless he remained in the room and answered their questions. The United States Supreme Court has observed that an "officer's subjective view that the individual under questioning is a suspect . . . bear[s] [on] the question whether the individual is in custody for purposes of *Miranda*" if the information is "communicated or otherwise manifested to the person being questioned . . . ." *Stansbury* v. *California*, 511 U.S. 318, 324, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994). Although "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest," the communication of such information may "affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of

Decide Cases," 93 Cornell L. Rev. 1, 41 (2007); see, e.g., *Daniels* v. *Essex Group, Inc.*, 937 F.2d 1264, 1271 (7th Cir. 1991) (observing that Seventh Circuit has declined to adopt multifactor test in Title VII sexual harassment cases because of "the potential for a mechanical application that overlooks or underemphasizes the most important features of the harassment inquiry").

State *v.* Brandon

action.'' (Internal quotation marks omitted.) Id., 325. Stated another way, in the present case, the officers' statements to the defendant that he was the sole and primary focus of their murder investigation ''would have affected how a reasonable person in [the defendant's] position would perceive his or her freedom to leave.'' Id.; see *United States* v. *Griffin*, supra, 922 F.2d 1348 (''[a]lthough custody is not inferred from the mere circumstance that the police are questioning the one whom they believe to be guilty, the fact that the individual has become the focus of the investigation is relevant to the extent that the suspect is aware of the evidence against him and this awareness contributes to the suspect's sense of custody'' (internal quotation marks omitted)); see also *State* v. *Castillo*, supra, 329 Conn. 348 (*D'Auria, J.*, dissenting) (''[a]n officer stating that he believes that the suspect committed a crime and has evidence to prove it may lead a person in the suspect's position and hearing those allegations to conclude that the officer will not permit him to leave'').

The pressure on the defendant to remain in the room and to answer the officers' questions was increased exponentially when LaMaine told him that, not only was he the prime suspect in the victim's murder, but a warrant for his arrest would be forthcoming if he did not provide his side of the story to the interrogating officers.[6] LaMaine's statements to the defendant were threats of arrest, plain and simple, and they must be considered

_____

[6] LaMaine admitted at the suppression hearing that he did not, in fact, have probable cause to obtain a warrant for the defendant's arrest at the time of the first interrogation. True or false, the threats of arrest plainly were intended to have a coercive effect on the defendant's choice to terminate the interview. See, e.g., *United States* v. *LeBrun*, supra, 363 F.3d 721 (deceptive interrogation tactics are relevant to custody analysis if ''a reasonable person would perceive the coercion as restricting his or her freedom to depart''); see also *Berkemer* v. *McCarty*, supra, 468 U.S. 442 (''the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation'').

State *v.* Brandon

as part of the in-custody analysis to determine whether the defendant was subjected to pressures that deprived him of a meaningful choice about whether to speak or remain silent. "[N]umerous courts have indicated that whether law enforcement officers threatened arrest or other penalties to induce cooperation is an important element to assess in evaluating whether a defendant was in custody." *United States* v. *Blakey*, 294 F. Supp. 3d 487, 494 (E.D. Va. 2018); see id., 494–95 (citing cases); see also, e.g., *United States* v. *DiGiacomo*, 579 F.2d 1211, 1214 (10th Cir. 1978) (holding that defendant was in custody for *Miranda* purposes, in part because he "was told he could be arrested and jailed that evening" if he did not meet and cooperate with officers). Threats of arrest are relevant because "[o]ne of the primary concerns motivating the *Miranda* protections is the danger of coercion [that] results from the interaction of custody and official interrogation. . . . This danger is manifest, for instance, [when] the defendant feel[s] compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess." (Citations omitted; internal quotation marks omitted.) *United States* v. *Blakey*, supra, 494; see also *Illinois* v. *Perkins*, 496 U.S. 292, 297, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990) ("[q]uestioning by captors, who appear to control the suspect's fate, may create mutually reinforcing pressures that the [c]ourt has assumed will weaken the suspect's will").

Second, although the defendant was not handcuffed or physically restrained, it is undisputed that his freedom of movement was severely restricted. The record does not reveal whether the door to the interrogation room was locked, but it is clear that the area of the building in which the defendant was questioned was locked and that the defendant was not free to move about the building without an escort.[7] The fact that the

_____

[7] The majority states that the defendant failed to fulfill his burden of establishing that he was in custody, in part because there is no evidence

State *v.* Brandon

defendant had been escorted to a restricted, locked and secured area, not accessible to the public, where he was left in the immediate control of armed police officers and then systematically questioned for ninety minutes about his alleged involvement in a recent murder, when considered in combination with the other factors discussed in this opinion, indicates that the defendant's freedom of movement had been restrained to the degree associated with a formal arrest. See, e.g., *United States* v. *Byram*, 145 F.3d 405, 409 and n.1 (1st Cir. 1998) (defendant "unquestionably [was] subject to deliberate custodial interrogation" because he was "already in custody, was taken to a separate room in the courthouse, left effectively in [a police officer's] immediate control, and then questioned systematically about his role in a criminal episode"); *United States* v. *Hartwell*, 296 F. Supp. 2d 596, 606–607 (E.D. Pa. 2003) (defendant was subject to custodial interrogation because he "was in a small private room, surrounded by two [Transportation Secu-

in the record that "there were any limitations placed on [the defendant's] ability to leave the secured areas of the building or the building itself." The assertion is arguable but very weak. The undisputed evidence in the record established that the area of the building in which the interrogation took place was locked, secured, and required an escort. At the end of the interrogation, moreover, LaMaine can be heard asking "if Pete's there," presumably referring to whether Peter Bunosso, the Chief Probation Officer, could escort the defendant out of the secured area of the building. I am unaware of anything in the record that would support a contrary factual determination. Arguably, in the absence of a specific finding by the trial court on this issue, the record does not permit us to conclude *with certainty* that, although the defendant clearly was required to be escorted to his meeting, he was not required to be escorted out of the building after his meeting ended. See, e.g., *Small* v. *Commissioner of Correction*, 286 Conn. 707, 716, 946 A.2d 1203 ("[w]hen the record on appeal is devoid of factual findings . . . it is improper for an appellate court to make its own factual findings"), cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008). But, based on the undisputed facts regarding the extent of security in the building, specifically, the requirement of an escort from the entrance of the building to the defendant's meeting with Calixte and the fact that Calixte escorted the defendant to Bunosso's office, a reasonable person in the defendant's position would have believed that he could not leave without assistance.

State *v.* Brandon

rity Administration] agents and a police officer blocking
the exit, and had just produced a suspicious item that
he had been exceedingly reluctant to reveal''), aff'd, 436
F.3d 174 (3d Cir.), cert. denied, 549 U.S. 945, 127 S. Ct.
111, 166 L. Ed. 2d 255 (2006). As the Fifth Circuit Court
of Appeals has explained, ''[i]nterrogations in public
settings are less [police-dominated] than [station house]
interrogations; the public nature reduces the hazard
that officers will resort to overbearing means to elicit
incriminating responses and diminishes the individual's
fear of abuse for failure to cooperate.'' *United States*
v. *Chavira*, 614 F.3d 127, 135 (5th Cir. 2010); see *Ber-
kemer* v. *McCarty*, supra, 468 U.S. 438 (''exposure to public
view both reduces the ability of an unscrupulous police-
man to use illegitimate means to elicit self-incriminating
statements and diminishes the [suspect's] fear that, if
he does not cooperate, he will be subjected to abuse'').
When a defendant is questioned by multiple police offi-
cers in a private, secured area, confronted with incon-
sistencies in his story, and accused ''of being untruthful,
all while [the officers] deliberately [withheld] *Miranda*
warnings because [he] had not yet confessed to a
crime,'' such questioning ''bear[s] [all] the hallmarks of
traditional custodial interrogation . . . .'' *United States*
v. *Chavira*, supra, 135.

Last, but by no means least, the defendant was a proba-
tioner, and the interrogation took place in a physical
setting that highlighted the coercive nature of his proba-
tionary status. LaMaine and Curet initiated the interro-
gation at the probation building following the defendant's
mandatory meeting with his probation officer. ''[W]hen
the confrontation between the suspect and the criminal
justice system is instigated at the direction of law
enforcement authorities, rather than the suspect, cus-
tody is more likely to exist.'' *United States* v. *Griffin*,
supra, 922 F.2d 1351. As the majority recognizes, the
location of the interview, in the probation office, ''pro-

State *v.* Brandon

vides some support for the defendant's contention that he was in custody.'' Further support can be found in the inherent psychological pressures faced by a suspect whose liberty already has been restricted by the constraints associated with probation and who faces further restraints, such as revocation of probation and incarceration, if he does not comply with the directives of his probation officer. See, e.g., *J. D. B* v. *North Carolina*, supra, 564 U.S. 279 (in determining whether suspect was in custody, court must consider ''[the] 'internal' or 'psychological' impact on perception''); *United States* v. *Axsom*, 289 F.3d 496, 500 (8th Cir. 2002) (''[i]n deciding whether a person was 'in custody,' we must examine both the presence and extent of physical and psychological restraints placed [on] the person's liberty during the interrogation'').

To understand the psychological pressures felt by a probationer in the defendant's position, I begin by reviewing the nature and function of probation, which is a penal status intended by design to be coercive. ''[P]robation is, first and foremost, a penal alternative to incarceration . . . . [P]robationers . . . do not enjoy the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions.'' (Internal quotation marks omitted.) *State* v. *Faraday*, 268 Conn. 174, 180, 842 A.2d 567 (2004). Probationers are not in custody by virtue of their status; nor are they at liberty to exercise their will like free citizens. Probationers agree to a set of standard conditions of probation and, in some cases, additional conditions imposed by the probation officer or the court. For example, all probationers are instructed to ''refrain from violating any criminal law of the United States, this state or any other state . . . .'' General Statutes § 53a-30 (a) (7); see, e.g., *State* v. *Lopez*, 341 Conn. 793, 795–96, 268 A.3d 67 (2022). At times, the conditions of probation

State *v.* Brandon

may require the probationer to "[s]ubmit to a search of [his] person, possessions, vehicle or residence when the [p]robation [o]fficer has a reasonable suspicion to do so." (Internal quotation marks omitted.) *State* v. *Moore*, 112 Conn. App. 569, 574, 963 A.2d 1019, cert. denied, 291 Conn. 905, 967 A.2d 1221 (2009). Additional conditions may also be imposed. See, e.g., *State* v. *Imperiale*, 337 Conn. 694, 707, 255 A.3d 825 (2021) ("the Office of Adult Probation properly may impose conditions of probation that place significant restrictions on a probationer's liberty during the term of his or her probation, if such restrictions are reasonably necessary"); *State* v. *Johnson*, 75 Conn. App. 643, 652, 817 A.2d 708 (2003) ("[p]ostjudgment conditions imposed by adult probation are . . . part of an administrative function that [§ 53a-30] expressly authorizes as long as it is not inconsistent with any previously court-imposed condition"); see also General Statutes § 53a-30 (a) (17) ("the court may . . . order that the defendant . . . satisfy any other conditions reasonably related to the defendant's rehabilitation").

A probationer who is found to be in violation of probation may have his probation revoked and be ordered to serve the unexecuted portion of his sentence in jail. See, e.g., *State* v. *Fagan*, 280 Conn. 69, 105, 905 A.2d 1101 (2006) (observing that revocation proceeding may "requir[e] an end to the conditional freedom obtained by a defendant at a sentencing that allowed him or her to serve less than a full sentence" (internal quotation marks omitted)), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007). The probation revocation hearing offers less protection to probationers than a criminal proceeding. See *State* v. *Faraday*, supra, 268 Conn. 183 ("[A probation] revocation proceeding . . . is not a criminal proceeding. . . . It therefore does not require all of the procedural components associated with an adversar[ial] criminal proceed-

State *v.* Brandon

ing.'' (Internal quotation marks omitted.)); see also
*Gagnon* v. *Scarpelli*, 411 U.S. 778, 782, 93 S. Ct. 1756,
36 L. Ed. 2d 656 (1973) (''[p]robation revocation, like
parole revocation, is not a stage of a criminal prosecu-
tion''). ''This is because it is well established that a
probation revocation proceeding is not a criminal pro-
ceeding but is instead more akin to a civil proceeding.''
(Internal quotation marks omitted.) *State* v. *Dudley*, 332
Conn. 639, 648, 212 A.3d 1268 (2019). At a revocation
proceeding, the state must prove each alleged violation
of probation only by a preponderance of the evidence
(rather than beyond a reasonable doubt); see, e.g., *State*
v. *Esquilin*, 179 Conn. App. 461, 470–71, 179 A.3d 238
(2018); and the rules of evidence do not apply to such
proceedings. See Conn. Code Evid. § 1-1 (d) (4); see
also *State* v. *Maietta*, 320 Conn. 678, 691, 134 A.3d 572
(2016) (recognizing that relevant hearsay evidence is
admissible at probation revocation hearing within dis-
cretion of trial court); *State* v. *Jacobs*, 229 Conn. 385,
392, 641 A.2d 1351 (1994) (observing ''that, unlike crimi-
nal trials, in which the exclusionary rule typically
applies, in probation revocation hearings, the exclusion-
ary rule typically does not apply'').

In light of the restrictions imposed on a probationer's
liberty and the severe repercussions for noncompliance
with the conditions of probation, a probationer is likely
to interpret any instruction or guidance from a proba-
tion officer as mandatory and feel pressured to comply
with the officer's requests, even if they are not compul-
sory. See *Fare* v. *Michael C.*, 442 U.S. 707, 722, 99
S. Ct. 2560, 61 L. Ed. 2d 197 (1979) (observing that
probationers may develop ''a relationship of trust and
cooperation'' with their officers); *People* v. *Elliott*, 494
Mich. 292, 315, 833 N.W.2d 284 (observing that ''inher-
ently compelling pressures'' exist in relationship between
parolee and parole officer and ''that both parolees and
probationers are under heavy psychological pressure

State *v.* Brandon

to answer inquiries made by their supervising officers''
(internal quotation marks omitted)), cert. denied, 571
U.S. 1077, 134 S. Ct. 692, 187 L. Ed. 2d 559 (2013); *State*
v. *Roberts*, 32 Ohio St. 3d 225, 230, 513 N.E.2d 720 (1987)
(stressing heavy psychological pressure to answer questions posed by probation officer, who is figure of authority and trust).[8] In my view, a probationer in the
defendant's position would have perceived Calixte's
escorted trip to the office of her supervisor at the conclusion of his mandatory probation meeting as a compulsory requirement, rather than a voluntary option.

The majority concludes that the defendant voluntarily
chose to attend the meeting in the office of Calixte's
supervisor because he failed to produce any evidence
that Calixte issued a direct order or threatened to initiate proceedings to violate his probation if he refused
to attend. I see no reason why the defendant should be
required to produce affirmative evidence of a direct
order or threat to satisfy the in-custody requirement.
The issue is not whether Calixte expressly ordered or
threatened the defendant to coerce him to attend the
interrogation but whether a reasonable person in the
defendant's position would have perceived Calixte's
request as an order under all of the surrounding circum-

_____

[8] As a separate matter, I have serious concerns about the role that the
Office of Adult Probation played in the interrogation of the defendant.
Probation officers act under the auspices of the Judicial Branch in requiring
the defendant to submit to the conditions of probation. See *State* v. *Jacobs*,
supra, 229 Conn. 393 ("the probation process operates as an arm of the
judiciary, not of the police or prosecution"); *State* v. *Fuessenich*, 50 Conn.
App. 187, 199, 717 A.2d 801 (1998) ("when a probation officer demands a
probationer's compliance with a condition of probation, he or she is acting
as a representative of the [J]udicial [B]ranch and not as a police officer"),
cert. denied, 247 Conn. 956, 723 A.2d 813, cert. denied, 527 U.S. 1004, 119
S. Ct. 2339, 144 L. Ed. 2d 236 (1999). Because probation officers are representatives of the Judicial Branch, rather than law enforcement, their involvement in actively facilitating police access to probationers, within the
probation office itself, for the purpose of furthering a criminal investigation
threatens to impair the public perception of their neutrality.

stances, such that refusal to comply could result in
violation of the defendant's probation. The record is
devoid of any evidence that Calixte ever informed the
defendant that there would be no adverse consequences
if he declined to attend the meeting in her supervisor's
office. Given the absence of such an advisement, the
pervasive restrictions on liberty imposed by the condi-
tions of probation, and the additional physical and psy-
chological restraints operative in the probation building
following the defendant's mandatory probation meet-
ing, I believe that a reasonable person in the defendant's
position would have perceived Calixte's request as a
command. By focusing on the absence of evidence of
an explicit order or threat, rather than on how Calixte's
statements would have been perceived by a probationer
in the defendant's position, the majority misapprehends
the nuanced and fact intensive nature of the *Miranda*
custody inquiry.[9]

[9] The majority states that the record is ambiguous "as to whether Calixte
informed the defendant that he was not required to attend" the meeting
and that "[i]t defies logic, when confronted with an ambiguous record, to
draw the inference favorable to the party who bears the burden of proof."
Footnote 13 of the majority opinion. The record may be ambiguous regarding
Calixte's precise statements to the defendant, but the record is unambiguous
with respect to the conditions surrounding the defendant's interrogation,
including the fact that the defendant was escorted to a locked and secured
area of the building—where he was not permitted to move about freely and
where he was questioned in a closed room by two armed police officers.
These facts, when considered in combination with the other psychological
factors at play in the probation context, clarify any ambiguity in the record
regarding whether a reasonable person in the defendant's position would
have believed that he had a real and meaningful choice to attend the meeting
in the office of Calixte's supervisor.

The majority relies on *Minnesota* v. *Murphy*, 465 U.S. 420, 438, 104 S. Ct.
1136, 79 L. Ed. 2d 409 (1984), to conclude that the defendant's fear of
revocation of his probation was unreasonable "because 'the [s]tate could
not constitutionally carry out a threat to revoke probation for the legitimate
exercise of the [f]ifth [a]mendment privilege' . . . ." Footnote 13 of the
majority opinion. Critical to the United States Supreme Court's holding in
*Murphy* was the fact that the conditions of probation at issue in that case
did not require the probationer to answer the probation officer's questions.
See *Minnesota* v. *Murphy*, supra, 438. The federal courts of appeals have

State *v.* Brandon

Given that a reasonable person in the defendant's position would have believed that he was required as a condition of his probation to meet and cooperate with LaMaine and Curet, just as he was required to meet and cooperate with his probation officer under threat of revocation of probation, I find the analysis of the Eighth Circuit Court of Appeals in *United States* v. *Ollie*, 442 F.3d 1135 (8th Cir. 2006), to be instructive. In that case, the defendant, Johnny Lee Ollie, Jr., was on parole when he was instructed by his parole officer to meet with the police following his regularly scheduled parole meeting. Id., 1136. The court found that "Ollie neither initiated contact with the . . . police nor voluntarily acquiesced to questioning." Id., 1138. The court reasoned that "Ollie's conduct revealed little more than an absence of resistance" and that it was "clear . . . that . . . Ollie was responding to pressure." Id. Because the failure to attend the meeting could have resulted in the revocation of Ollie's parole; id.; the court noted that "a reasonable person in . . . Ollie's position would have been extremely reluctant either to refuse

recognized that the rule articulated in *Murphy* is not controlling when a probationer is required as a condition of probation to comply with a probation officer's directives and answer questions truthfully. Under those circumstances, it is reasonable for a probationer to believe that the refusal to answer questions would result in a revocation of probation. See *McKathan* v. *United States*, 969 F.3d 1213, 1228 (11th Cir. 2020) (concluding that reasonable person on federal supervised release would understand that he could be punished for his "refusal to answer his probation officer's questions" and, therefore, that petitioner's statements were obtained in violation of fifth amendment); *United States* v. *Saechao*, 418 F.3d 1073, 1078–1079 (9th Cir. 2005) (rejecting government's claim that "a probationer is subject to threat of penalty only when the state *explicitly* announces that it will impose a penalty for the invocation of his [f]ifth [a]mendment rights" and concluding that probationer's statements were involuntary because he "was required, as a condition of his probation, to 'promptly and truthfully *answer all* reasonable inquiries' " ((emphasis in original)). Because the defendant in the present case was required as a condition of his probation "to cooperate with his probation officer[s]" and to "follow their directions," it would have been objectively reasonable for a person in the defendant's position to fear revocation of his probation.

State *v.* Brandon

the interview or to terminate it once it began.'' Id., 1140. This one factor, ''[a]bove all else,'' led the court to conclude that the ''the failure to advise . . . Ollie of his rights pursuant to *Miranda* requires the suppression of his initial oral confession . . . .'' Id., 1140.

Similarly, in *United States* v. *Barnes*, 713 F.3d 1200 (9th Cir. 2013), the Ninth Circuit Court of Appeals held that the defendant, Michael D. Barnes, was in custody for purposes of *Miranda* because he ''did not appear voluntarily but rather was told to appear for a meeting with his parole officer under threat of revocation of parole.'' Id., 1204. The meeting did not occur on its usual day or location in the lobby of the parole building but, rather, ''Barnes was searched and escorted into the interior of the building through an electronically locked door.'' Id., 1203. Behind the locked door were ''two [Federal Bureau of Investigation (FBI)] agents waiting to question [Barnes]'' about a drug transaction. Id. ''The FBI agents directly confronted Barnes with evidence of guilt [for approximately ten to twenty minutes] before administering the *Miranda* warnings.'' Id., 1204. The court determined that Barnes was in custody and entitled to *Miranda* warnings at the commencement of the interrogation, even though ''he was not handcuffed, arrested, or physically intimidated in any way,'' because Barnes ''was in a police-dominated, confined environment in which his presence was mandated by his parole terms . . . .'' Id., 1204.

I find the logic and reasoning of *Ollie* and *Barnes* persuasive. The defendant did not voluntarily appear at the meeting with LaMaine and Curet and affirmatively consent to answer their questions. Instead, he was under extreme ''pressure resulting from a combination of the surroundings and circumstances''; id., 1204–1205; not the least of which was the looming prospect of revocation of his probation if he refused to comply. Accordingly, the failure to issue *Miranda* warnings necessi-

State *v.* Brandon

tates the suppression of the defendant's inculpatory admissions during his first interrogation.

The fact that LaMaine told the defendant that he was free to leave does nothing to alter my conclusion regarding the defendant's custodial status. Indeed, a more careful analysis of LaMaine's ostensibly liberatory comments demonstrates that they actually conveyed a strongly coercive message. To begin with, the defendant was not informed that he could "walk out" of the room until twenty-one minutes into the interrogation, after he already had implicated himself in the victim's murder. This delay is significant.[10] The practice of questioning a suspect first, and then advising him that he is free to leave after eliciting a confession, is similar to the "question first" practice expressly denounced in the *Miranda* context in *Missouri* v. *Seibert*, 542 U.S. 600, 611–13, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004) (opinion announcing judgment). In *Seibert*, the United States Supreme Court held that the "police protocol for custo-

---

[10] The majority dismisses the delay on the basis of *State* v. *Pinder*, 250 Conn. 385, 736 A.2d 857 (1999), and *State* v. *Lapointe*, 237 Conn. 694, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996), but the majority's reliance on these cases is misplaced. See footnote 16 of the majority opinion. *Pinder* and *Lapointe* stand for the proposition that a defendant's inculpatory admissions do not transform a noncustodial interrogation into a custodial interrogation for purposes of *Miranda*. The issue in the present case is not whether the defendant's inculpatory admissions transformed a previously noncustodial interrogation into a custodial one; the issue is whether the interrogation was custodial from the outset and whether the officers' advisements that the defendant was free to leave, given twenty-one minutes after the commencement of the interrogation and *after* eliciting inculpatory admissions from the defendant, would have led a reasonable person in the defendant's position to believe that he was not in custody. The majority has cited no authority for its conclusion that such advisements have a "powerful effect" despite their significant delay, and I have found no authority to support that counterintuitive supposition. Permitting free to leave advisements to have a nunc pro tunc powerful effect would allow interrogating officers to inoculate themselves against the administration of *Miranda* warnings simply by waiting until after a suspect has made damaging admissions to inform him that he is free to leave.

State *v.* Brandon

dial interrogation that calls for giving no warnings of the rights to [remain silent] and [to] counsel until interrogation has produced a confession" was unconstitutional. Id., 604. The manifest intent of the question first practice "is to get a confession the suspect would not make if he understood his rights at the outset; the sensible underlying assumption is that with one confession in hand before the warnings, the interrogator can count on getting its duplicate, with trifling additional trouble." Id., 613. Midstream *Miranda* warnings typically are constitutionally ineffective because they fail "to convey a message that [the suspect] retained a choice about continuing to talk." Id., 617. Likewise, I believe that midstream advisements regarding a suspect's freedom to leave, after a confession already has been elicited through persistent questioning, fail to convey to a suspect that he has a choice regarding his participation in the interrogation.

Additionally, and perhaps most troubling, is the fact that LaMaine's statements regarding the defendant's freedom to leave were not without restriction—the defendant was told repeatedly that he was free to leave, *but, if he chose to do so, he would be arrested for the victim's murder.*[11] This is the very opposite of a

[11] Even unqualified free to leave advisements must be assessed in light of the surrounding circumstances and are ineffective if those circumstances would lead a reasonable person to believe otherwise. See, e.g., *State* v. *Mangual*, supra, 311 Conn. 204 n.16 ("advising the suspect that he was not under arrest and was free to leave was insufficient to support a conclusion that he was not in custody for purposes of *Miranda*"); see also *United States* v. *Hashime*, 734 F.3d 278, 284 (4th Cir. 2013) ("[E]ven to the extent that law enforcement told [the defendant] that he did not have to answer questions and was free to leave, that by itself does not make the interrogation [noncustodial]. Although a statement that the individual being interrogated is free to leave may be highly probative of whether, in the totality of the circumstances, a reasonable person would have reason to believe he was in custody, such a statement is not talismanic or sufficient in and of itself to show a lack of custody." (Internal quotation marks omitted.)); *United States* v. *Craighead*, 539 F.3d 1073, 1088 (9th Cir. 2008) ("The mere recitation of the statement that the suspect is free to leave or terminate the interview . . . does not render an interrogation [noncustodial] per se. We must con-

State *v.* Brandon

voluntary choice: the defendant was explicitly advised
that his only chance of avoiding arrest was to cooperate
and tell the police his side of the story. The nature
and extent of LaMaine's threats of arrest, which I have
described in detail, are precisely the type of coercive
interrogation tactic that is intended to overbear a sus-
pect's will and to elicit a confession. See, e.g., *United
States* v. *Johnson*, 351 F.3d 254, 261, 263 (6th Cir. 2003)
("[p]olice promises of leniency and threats of prosecu-
tion can be objectively coercive," particularly if they
cannot be "lawfully executed"); cf. *State* v. *Griffin*,
339 Conn. 631, 711–12, 262 A.3d 44 (2021) (*Ecker, J.*,
concurring in part and dissenting in part) (recognizing
that there is nothing improper about giving "[a defen-
dant] an accurate statement of the law, consistent with
the known facts of the [crime]," but that falsehoods
intended to misrepresent law are coercive), cert.
denied, U.S. , 142 S. Ct. 873, 211 L. Ed. 2d 575
(2022).[12]

The majority relies heavily on the officers' "free to
leave" commentary as a significant indicator that a rea-
sonable person in the defendant's position would have
believed that he was, in fact, free to terminate the inter-

sider the delivery of these statements within the context of the scene as
a whole.").

[12] As I stated previously in this opinion, LaMaine admitted at the suppres-
sion hearing that he did not, in fact, have probable cause to arrest the
defendant at the time he threatened to obtain an arrest warrant during the
first interrogation. See footnote 6 of this opinion. Again, whether the threat
was true or a ploy does not make a difference in the present analysis, in
the sense that the issue is whether the defendant would have reasonably
*perceived* the threat to be true. See id. Nonetheless, I cannot disregard
entirely the fact that LaMaine himself manifestly believed that it was neces-
sary to exert psychological pressure on the defendant to persuade him to
remain in the room and talk, by communicating to the defendant false
information about the strength of the evidence and his vulnerability to arrest.
The point is not that the information was false but that the interrogating
officer, by making it a theme of the interrogation, evidently found it necessary
to influence the defendant's decision making.

State *v.* Brandon

rogation and to request an escort out of the building. I believe, to the contrary, that the comments conveyed— and were intended to convey—precisely the opposite meaning to the defendant. Because the defendant was told that he could not end the interrogation without suffering a significant adverse consequence (arrest for the victim's murder), LaMaine's statements taken as a whole actually exacerbated, rather than mitigated, the coercive nature of the police-dominated environment. See *United States* v. *DiGiacomo*, supra, 579 F.2d 1214; *United States* v. *Blakey*, supra, 294 F. Supp. 3d 494; see also, e.g., *United States* v. *Czichray*, 378 F.3d 822, 825 (8th Cir. 2004) (threats of arrest are relevant to custody analysis), cert. denied, 544 U.S. 1060, 125 S. Ct. 2514, 161 L. Ed. 2d 1109 (2005); *State* v. *James B.*, 129 Conn. App. 342, 347, 19 A.3d 264 (2001) (same), cert. denied, 302 Conn. 910, 23 A.3d 1248 (2011).

The majority acknowledges that threats of arrest "may have an effect on a reasonable person's perception that he is free to leave" but concludes that the threats of arrest in the present case would not have led the defendant to believe that he "was restrained to a degree associated with a formal arrest" because the defendant was told he would be arrested in the *future* but was not under arrest *now*. Footnote 12 of the majority opinion. The majority's conclusion regrettably sanctions yet one more transparent ploy for the police to evade the requirements of *Miranda*: simply inform the suspect that, if he chooses to remain silent, his freedom will end tomorrow rather than today. By approving this technique, the majority ignores the plain fact that an explicit threat of an impending future arrest will dilute or even altogether eradicate the significance of advisements that a person is free to leave. Its claim is unsupported by case law and contrary to common sense. It cannot seriously be maintained that a threat by the interrogating officers to arrest a suspect in the near future, but

State *v.* Brandon

not right now, unless the suspect remains and answers questions will have no significant impact on the person's perception that he is truly free to leave. In addition to the other factual circumstances discussed at length in this opinion, the interrogating officers informed the defendant that they had sufficient evidence to arrest him for the victim's murder and that they would procure an arrest warrant if he terminated the interrogation or refused to tell his side of the story. Given the officers' use of "incriminating information *against* [*the defendant*]" and threats of arrest to "leverage their authority over [him]," I believe that a reasonable person in the defendant's position would have perceived his freedom of action to have been restricted to the degree associated with a formal arrest. (Emphasis in original.) *United States* v. *Panak*, 552 F.3d 462, 469 (6th Cir. 2009). Accordingly, the defendant's inculpatory admissions in his first interrogation should have been suppressed.

The state appears to argue that the admission of the defendant's statements in his first interrogation, if improper, was harmless because the defendant's statements in his second interrogation, which was preceded by *Miranda* warnings and in which the defendant made the same inculpatory admissions, properly were admitted into evidence. I cannot agree. As I previously explained, in *Missouri* v. *Seibert*, supra, 542 U.S. 600, the United States Supreme Court held that the police could not evade the requirements of *Miranda* by engaging in the "question first" stratagem of eliciting an unwarned confession before administering *Miranda* warnings, and then eliciting the same confession again, unless "a reasonable person in the suspect's shoes would . . . have understood [the *Miranda* warnings] to convey a message that [he or] she retained a choice about continuing to talk." Id., 617 (opinion announcing judgment). The court in *Seibert* enumerated five nonexclusive factors to determine whether the bifurcated procedure will pass

State *v.* Brandon

constitutional muster in any particular case: "[1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first." Id., 615; see *State* v. *Donald*, 325 Conn. 346, 360 n.8, 157 A.3d 1134 (2017) (acknowledging that *Seibert* was "plurality" opinion but nonetheless adopting its analysis to assess admissibility of second warned confession).

I conclude that the *Miranda* warnings administered prior to the defendant's second interrogation were constitutionally ineffective under *Seibert*. The defendant's second interrogation was comparable in length to the first interrogation and occurred approximately five hours later at the Bridgeport police station. The interrogating officers, Curet and Detective Robert Winkler, treated the second interrogation as a mere continuation of the first. Indeed, at the commencement of the second interrogation, Winkler informed the defendant that they were just seeking to "continue the conversation that [the defendant] had" earlier that day "to work out a couple more details on this." As the majority recognizes, "[f]or the most part . . . during the second [interrogation], the police officers asked the defendant to review the account he had provided to them during the first [interrogation]." Under these circumstances, the second interrogation clearly was not "distinct from the first, unwarned and inadmissible [interrogation]," and should have been suppressed.[13] *Missouri* v. *Seibert*, supra, 542 U.S. 612 (opinion announcing judgment).

___

[13] The state also argues that the admission of the defendant's statements during the first interrogation "was harmless because the defendant's statements during [that interrogation] did not amount to a confession." The exclusionary rule, of course, is not limited to outright confessions of guilt. See *Miranda* v. *Arizona*, supra, 384 U.S. 476 ("The warnings required and the waiver necessary in accordance with [*Miranda*] are, in the absence of

State *v.* Brandon

Taken together, the circumstances surrounding the questioning of the defendant do not permit me to conclude that the defendant voluntarily subjected himself to a ninety minute police interrogation at the end of his mandatory probation meeting. It is especially troubling that the majority reaches the opposite conclusion with no suggestion of disapproval as to the coercive and deceptive interrogation methods employed by the police officers in this case. Indeed, it appears to normalize deliberate and strategic coercion and manipulation as a feature of police interrogation by explicitly acknowledging that "[i]t is undeniable that the defendant was questioned in a coercive environment" but concluding that "a coercive environment, without more, does not establish that an interrogation was custodial." Text accompanying footnote 12 of the majority opinion. The coercive pressures applied to the defendant in the present case far exceeded those that are inherent in the power differential between interrogator and suspect. See, e.g., *Oregon* v. *Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977) (recognizing that "[a]ny interview of one

a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant. No distinction can be drawn between statements [that] are direct confessions and statements [that] amount to 'admissions' of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination."). The present case illustrates the harmful effects that can result from incriminating statements short of a full confession. The state's case against the defendant was not strong—there were no eyewitnesses to the victim's murder or any physical or forensic evidence implicating the defendant in the crime. In my view, the defendant's admission that he had had a heated argument with the victim, drove to meet the victim, and was present when the victim was shot and killed likely had a profound impact on the jury and contributed to its guilty verdict. Under these circumstances, the admission of the defendant's statements cannot be deemed harmless beyond a reasonable doubt. See, e.g., *State* v. *Mangual*, supra, 311 Conn. 214 (state bears burden of proving that violation of defendant's *Miranda* rights was harmless beyond reasonable doubt, and erroneous admission of statements procured in violation of *Miranda* is not harmless if it "may have had a tendency to influence the judgment of the jury" (internal quotation marks omitted)).

State *v.* Brandon

suspected of a crime by a police officer will have coercive aspects to it''). The pressures felt by the defendant were not merely the result of coercion in the air—the ambient and unavoidable dynamics inherent in the power imbalance that exist any time armed police officers interrogate a private individual. Instead, the coercion was deliberately created and directly applied to the defendant, with the intent to manipulate and pressure him to confess to the crime under investigation. It is not too much to require police officers, at the very least, to advise a suspect of his constitutional rights, as prescribed by *Miranda* and its progeny, before undertaking such an interrogation. Our decision today gives police officers an incentive to evade the requirements of *Miranda* merely by telling a suspect that he is free to leave but explaining why doing so will result in his arrest.

The simple truth is that such methods ultimately do great harm to the very legal order put forward to justify those methods in any given case. No public good is served when we reward official coercion accomplished by sly techniques designed to evade constitutional principles. Our approval of such methods reflects badly on the criminal justice system and, over time, erodes public confidence in the fairness and legitimacy of the process. The only positive news is that it remains an open question whether the state constitution provides broader prophylactic protection in this context. See *State* v. *Purcell*, 331 Conn. 318, 321, 203 A.3d 542 (2019) (adopting "a more protective prophylactic rule" for *Miranda* rights under state constitution). Because the defendant did not raise an independent state constitutional claim on appeal, we must leave the resolution of that issue for another day. See footnote 3 of the majority opinion.

For the foregoing reasons, I believe that the defendant was in custody at the time of his first interrogation and entitled to the full panoply of protections pre-

scribed by *Miranda*. Because the defendant's inculpatory statements should have been suppressed, I respectfully dissent.

————————————————